86 A.3d 831

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Lance ARRINGTON, Appellant.**

Supreme Court of Pennsylvania.

Argued March 10, 2010.

Submitted Nov. 4, 2013.

Decided Feb. 28, 2014.

508

510

512

Jack L. Gruenstein, Marshall, Dennehey, Warner, Coleman & Goggin, for Lance Arrington.

Hugh J. Burns, William George Young, Philadelphia District Attorney's Office, Amy Zapp, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## OPINION

Justice BAER.[1]

Appellant Lance Arrington appeals from the sentence of death imposed by the Philadelphia County Common Pleas Court after a jury convicted him of first-degree murder and violating the Uniform Firearms Act. For the reasons stated herein, we affirm Appellant's conviction and judgment of sentence.[2]

1. This matter was reassigned to this author, and was held internally pending our decision in *Commonwealth v. Holmes*, 621 Pa. 595, 79 A.3d 562 (2013).

2. This Court automatically reviews direct appeals from the imposition of death sentences pursuant to 42 Pa.C.S. § 9711(h)(1).

The record indicates that Appellant began dating the victim, Tondra Dennis, after he moved to Philadelphia in July, 1993. As the relationship progressed, Tondra's friends observed bruises, scars, and bite marks on her body that she attributed to Appellant, whom she described as abusive. In the spring of 1995, Tondra met a man named Cleveland English and secretly began spending time with him. As she grew closer to English, they discussed marriage, but Tondra was concerned about leaving Appellant. When English visited her at a street festival in June, 1995, Tondra was "horrified" and ordered English to stay away from her because Appellant carried a gun, and would shoot English without hesitation. Notes of Testimony ("N.T."), Feb. 10, 2000, at 124. English obeyed Tondra's command and avoided her for the remainder of the day. One of Tondra's closest friends, Fay Millner, testified that during the time that she and Tondra occupied a vendor booth at the street festival, and presumably after English's departure, Appellant hid behind a tree and stared at Tondra for approximately one hour. *See* N.T., Feb. 11, 2000, at 31.

On October 3, 1995, Tondra filed a complaint against Appellant with Philadelphia Detective Jacqueline Hart and reported several instances of physical and emotional abuse including beatings, death threats, and a break-in at her parents' home. To support her claims, she produced photographs of her injuries and an audiotape that contained a recorded telephone message in which Appellant threatened to kill her and her family. The photographs were consistent with Tondra's physical appearance at the time of the interview; Detective Hart observed numerous signs of physical abuse on Tondra's body including facial bruising, a black eye, and a bite mark on Tondra's left arm. At the conclusion of the interview, Detective Hart charged Appellant with multiple crimes.

Tondra also contacted Maureen Welsh, a parole officer who had been supervising Appellant since July, 1993.[3] Tondra gave a statement to Officer Welsh, provided a copy of the

---

3. Officer Welsh testified that she began supervising Appellant in July, 1993, when he moved to Philadelphia after being released from a New York prison. *See* N.T., Feb. 9, 2000, at 73.

audiotaped death threats, and allowed the officer to photograph her injuries. Upon listening to the audiotape, from which she was able to positively identify Appellant's voice, Officer Welsh advised Tondra to avoid her parents' home and stay at a secure location. The following day, as Officer Welsh was discussing the matter with her supervisor, she received a frantic telephone call from Tondra's father informing her that Appellant was pacing back and forth in front of the Dennis residence. Based on that information, Officer Welsh accompanied a team of parole agents to the house with orders to detain Appellant. Shortly thereafter, when the agents arrested Appellant on a nearby street, he was carrying a black gym bag that contained a bolt cutter and a dead bolt that had been removed surreptitiously from the rear entrance to the Dennis residence.

Following his arrest, Appellant was transported to the state of New York for parole revocation proceedings. A hearing was scheduled for January 25, 1996, and New York parole revocation specialist Darcella Jones telephoned Tondra numerous times to secure her attendance. Based on their telephone conversations, Jones assumed that Tondra would testify against Appellant at the hearing; however, on January 2, 1996, Jones received a notarized letter from Tondra indicating that Appellant was innocent and that Tondra fabricated all of the allegations to punish Appellant after he informed her that he had been unfaithful to her. Jones wrote a letter to Tondra imploring her to testify against Appellant and received a second letter from Tondra, on January 22, 1996, reiterating that the charges were false and that she would not be attending the hearing. When Officer Welsh intervened on Jones's behalf, Tondra explained that if she testified against Appellant, she would be killed. *See* N.T., Feb. 9, 2000, at 88. Unable to persuade Tondra to attend the parole revocation hearing, Jones could not sustain the charges against Appellant, and he was released from custody on January 30, 1996.

Tondra Dennis was murdered at 11:30 p.m. on February 9, 1996, ten days after Appellant was released from jail. Lucille Fauntleroy testified that on the night in question, she was

making coffee in her Philadelphia home when she heard a commotion at the rear of the house. She extinguished the lights and walked to the kitchen window, which overlooks 54th Street, and she observed a man and a woman arguing near the curb. Although she had a clear view of the couple, Fauntleroy could not see the man's face because he was standing with his back to the window.[4] As Fauntleroy turned to walk away, she heard a "pow" sound. N.T., Feb. 11, 2000, at 12. When she returned her gaze to the window, the woman was no longer visible, and the man was running along 54th Street. Fauntleroy never saw the man's face, and no one else witnessed the incident.

Philadelphia Police Officer Crystal White was patrolling nearby when she received a radio dispatch indicating that an individual had been shot at the intersection of 54th and Upland Streets. She drove to the intersection and found Tondra's lifeless body lying in the street approximately 357 feet from the residence Appellant previously shared with his mother. Two nine-millimeter cartridge casings were recovered near the body, but no weapons were found. An autopsy revealed that Tondra had been shot once in the neck with a nine-millimeter handgun, and the bullet severed her spinal cord, which caused her to suffocate. The medical examiner opined that the manner of death was homicide.

The ensuing investigation stalled when the lead investigator, Detective William Egenlauf, broke his leg and took an extended leave of absence followed by six months of restricted duty. As a result, the case was re-assigned to Philadelphia Homicide Detective Thomas Kane in January, 1998. After speaking with numerous individuals in Philadelphia and New York who were acquainted with Appellant, Detective Kane obtained an arrest warrant charging Appellant with the murder of Tondra

4. The defense attempted to show that the man described by Fauntleroy could not have been Appellant because Fauntleroy gave a statement to police indicating that the man was slightly taller than Tondra, and, in reality, Tondra was several inches taller than Appellant. *See* N.T., Feb. 11, 2000, at 24–25. However, on re-direct examination, Fauntleroy explained that the man could have appeared taller than he actually was because the sidewalk outside her home "slopes down into the street." *Id.* at 26.

Dennis. The arrest warrant was forwarded to New York authorities who believed Appellant was living in an apartment building located in the Bronx, and, on April 3, 1998, four detectives from New York City's 44th Precinct proceeded to that address to execute the warrant. When no one answered the door, one of the detectives peered through a window and saw an individual who matched Appellant's description. As Appellant was wanted for murder, the detectives summoned an emergency response team that surrounded the building and initiated contact with Appellant through a hostage negotiator. Approximately two hours and fifteen minutes later, Appellant surrendered peacefully to law enforcement officers.

Appellant maintained his innocence and requested a jury trial. Over the course of the eight-day trial, the Commonwealth sought to prove Appellant's guilt by documenting his abusive relationship with Tondra, establishing that he was in Philadelphia on the night of the murder, and showing that he harassed other girlfriends in a similar manner. To accomplish the second and third objectives, the Commonwealth presented testimony that Appellant patronized a Philadelphia pizzeria hours before Tondra was killed, notwithstanding that he contended that he was in New York at the time, and that Appellant attempted to control three other female partners through acts of violence and intimidation that prompted criminal charges and resulted in convictions for arson and assault. N.T., Feb. 2, 2000, at 56–58. Appellant downplayed the significance of his prior convictions, claimed that he and Tondra reconciled shortly before her death, and called an alibi witness, Esperita Granville, who testified that Appellant continuously resided in New York City from February through mid-March, 1996. According to Granville, Appellant moved into her Bronx apartment prior to the murder, and he returned home each night by 9:00 p.m. to comply with a curfew imposed by the New York State Board of Parole.

Appellant was convicted of first-degree murder and persons not to possess firearms on February 17, 2000.[5] Following the

5. The offenses are codified at 18 Pa.C.S. § 2502(a) and § 6105(a)(1), respectively.

penalty hearing, the jury found that the single aggravating factor—that Appellant had a significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9), outweighed the mitigation evidence of Appellant's "fatherhood," which the jury found pursuant to the catchall mitigating circumstance codified at 42 Pa.C.S. § 9711(e)(8) (relating to "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense"). Sentencing Verdict Slip, Feb. 22, 2000, at 1.[6] Accordingly, the jury rendered a verdict of death. On February 22, 2000, the trial court sentenced Appellant to death for the murder conviction and imposed no further penalty for the firearm offense. Appellant obtained new counsel and filed post-sentence motions, which were denied. This direct appeal followed.

## I. Sufficiency of the Evidence

We begin, as we must in every capital case, by reviewing the evidence to ensure that it is sufficient to support the first-degree murder conviction. *Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102, 114 (2004); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982). In conducting our review, we must determine whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt. *Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618, 624 (2010). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, and the jury, in passing upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence. *Id.*

In the instant case, Appellant challenges the sufficiency of the evidence with respect to both of his convictions. He asserts that neither offense was proven beyond a reasonable doubt because the victim was killed with a handgun, and the

6. Five defense witnesses offered testimony during the penalty phase regarding Appellant's character and personal background, including the fact that he has a daughter.

Commonwealth offered no proof that he possessed a gun on the night of the murder.

In order to sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). Specific intent and malice may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Id.* at 1133–34. A conviction for unlawful possession of a handgun under 18 Pa.C.S. § 6105(a)(1) requires proof that the defendant possessed a firearm and that he had a prior conviction for an offense listed in section 6105(b). The term "firearm" is defined in section 6105(i) as any weapon that is "designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any such weapon."

Appellant concedes that Tondra's killing was committed with malice and a specific intent to kill, and that he had a prior conviction for an offense enumerated in 18 Pa.C.S. § 6105(b). He argues, however, that the evidence was insufficient to support his convictions of first degree murder and unlawful possession of a firearm because there was no proof that he possessed a firearm on the night of the murder. We disagree. The record establishes that a man armed with a nine-millimeter handgun shot Tondra in the neck during an altercation that occurred near the home of Appellant's mother. Additional testimony established that Appellant had been romantically involved with Tondra, that he had beaten her on numerous occasions, that he had threatened to kill Tondra and her family, and that New York authorities attempted to revoke his parole shortly before the murder because Tondra reported the threats and beatings to his parole officer. Viewed in the light most favorable to the Commonwealth, this circumstantial evidence was clearly sufficient to support the conclusion that Appellant was responsible for Tondra's murder. The jury was free to infer that upon his release from prison, Appellant obtained a handgun, travelled from New York to Philadelphia,

and shot Tondra in the neck with malice and the specific intent to kill because she wanted to end their relationship, and that he discarded the handgun after the shooting. Accordingly, Appellant's challenges to the sufficiency of the evidence fail.

## II. Weight of the Evidence

 In a similar vein, Appellant contends that the verdict was contrary to the weight of the evidence because no one saw him carrying a handgun on the night of the murder.

A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Smith,* 604 Pa. 126, 985 A.2d 886, 897 (2009) (quoting *Commonwealth v. Diggs,* 597 Pa. 28, 949 A.2d 873, 879 (2008)).

The trial court rejected Appellant's weight-of-the-evidence claim, finding that the jury's determination of guilt was adequately supported by credible evidence. *See* Trial Court Opinion, Feb. 28, 2007, at 13. Based on our review of the record, we discern no abuse of discretion and affirm the trial court's ruling.

## III. Evidence of Other Criminal Activity

 In his third issue, Appellant argues that the trial court abused its discretion in admitting evidence of additional crimes committed against three other girlfriends, their

friends, and their families.[7] Appellant claims these matters were completely irrelevant and served only to inflame the passions of the jury, prompting it to convict him of Tondra's murder on the theory that he has a propensity to commit acts of violence against women. In the alternative, Appellant argues that if the evidence was relevant to this case, its probative value was substantially outweighed by its prejudicial effect on the jury.

The Commonwealth acknowledges that evidence of other bad acts is inadmissible to demonstrate a propensity for violence or unsavory character, but maintains that the evidence in question was introduced for the legitimate purpose of proving a common scheme to control girlfriends through violence and intimidation.[8] Noting that it was forced to rely extensively upon circumstantial evidence in this case, the Commonwealth asserts that the probative value of the disputed evidence significantly outweighed its prejudicial impact,

7. In arguing this point, Appellant contends that the court also erred in allowing a prosecution witness to read an excerpt from a 1991 parole hearing transcript where Appellant stated that he had a propensity for violent behavior. See Brief for Appellant at 21. However, although defense counsel repeatedly objected to that evidence on relevancy grounds, he did not make the argument presented on appeal. See N.T., Jan. 19, 2000, at 35–37; N.T., Feb. 8, 2000, at 95–96; N.T., Feb. 10, 2000, at 4. Appellant's present contention that the parole hearing evidence was prohibited under Pa.R.E. 404(b) was never raised in the trial court and is, therefore, waived. See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); Commonwealth v. Freeman, 573 Pa. 532, 827 A.2d 385, 403 (2003) (abrogating the relaxed waiver doctrine in capital direct appeals).

8. Appellant disputes that the evidence was proffered to establish a common scheme, citing an exchange during pretrial motions where the trial court remarked that as a general rule, acts of domestic violence do not "fit within the most narrow definition of common plan, scheme and design." N.T., Jan. 11, 2000, at 17–18. Seizing upon this isolated statement, he maintains that the trial court employed a relaxed evidentiary standard and invented a domestic violence "exception" to the prohibition against other crimes evidence, thus enabling the Commonwealth to discuss unrelated criminal matters that demonstrated a propensity to commit the offense charged. Brief for Appellant at 26 n. 2. For reasons explained below, this claim is baseless, for the record is clear that the evidence in question was admitted in accordance with established legal principles.

which was tempered by repeated cautionary instructions directing the jury not to view Appellant's prior conduct as evidence of bad character or criminal tendencies.

 Our standard of review is well-settled. The admissibility of evidence is within the sound discretion of the trial court, and we will not disturb an evidentiary ruling absent an abuse of that discretion. *Commonwealth v. Flor,* 606 Pa. 384, 998 A.2d 606, 623 (2010). Pennsylvania Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). Such evidence may be admitted, however, if offered for a valid purpose such as proving the existence of a common scheme, establishing an individual's motive, intent, or plan, or identifying a criminal defendant as the perpetrator of the offense charged. *See* Pa.R.E. 404(b)(2); *see also Commonwealth v. Briggs,* 608 Pa. 430, 12 A.3d 291, 337 (2011) (citing *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 419 (2008)). In order for evidence of other criminal activity to be admissible to establish a common scheme, two conditions must be satisfied: (1) the probative value of the evidence must outweigh its potential for prejudice against the defendant, *see* Pa.R.E. 404(b)(3); and (2) "a comparison of the crimes must establish a logical connection between them." *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1318 (1995).

In the case at bar, the Commonwealth presented evidence that Appellant physically assaulted three other girlfriends when they attempted to break up with him or interacted with other men. The first incident involved Victoria Dexter, who started dating Appellant in 1978 when she was a teenager living in New York City. Dexter testified that as the relationship progressed, Appellant began to follow her and telephone her incessantly. When she attempted to end the relationship, he threatened to harm her older brother and "scar her for life." N.T., Feb. 8, 2000, at 107. Appellant continued to follow Dexter and instituted a campaign of harassment where he set fire to her apartment, slashed furniture, threw her belongings off a terrace, and inflicted two beatings upon her,

one of which left a scar on Dexter's face. Dexter's brother, Michael, also suffered two unprovoked attacks during this period. In the first incident, Appellant struck Michael in the back of the head with a baseball bat, and, in the second, Appellant threw Michael to the ground and punched him in the face. These events resulted in criminal charges that were resolved on September 18, 1979, when Appellant pled guilty to one count of arson and two counts of assault and received a two-to-six-year prison sentence. *See* N.T., Feb. 10, 2000, at 56.

Appellant was paroled on January 30, 1984, and soon began dating Sandra Williams, another young woman who resided in New York City. Williams testified that Appellant physically assaulted her three times during their two-year relationship. The first incident, which involved a punch to the face, happened in the fall of 1984. The second incident occurred on December 24, 1984, after Williams informed Appellant that a male friend who was serving in the armed forces planned to visit her over the holidays. Williams testified that she and her male friend were walking together on a public street when Appellant confronted them and brandished a pistol. When Williams stepped in front of her companion and asked Appellant not to shoot him, Appellant pistol-whipped her, fracturing her jaw in three places. Eleven months later, on November 24, 1985, Williams endured another pistol-whipping that left a permanent knot on her head and further weakened her jawbone. *See* N.T., Feb. 9, 2000, at 106–107. Williams testified that she had no further contact with Appellant after the final assault, which occurred while she was visiting a female friend and two male acquaintances.

The jury also heard testimony that Appellant maimed George Pratt, a friend of Williams, after George engaged her in conversation on a public sidewalk. George's brother, Joseph Pratt, testified that on the evening of October 19, 1985, Appellant went to George's apartment and struck him in the shoulder with an axe as George approached the front door. When George fled on foot, Appellant retrieved a gun, fired a bullet in Joseph's direction, and ran away. The bullet grazed

the face of another bystander, Robert Pratt, who was not seriously hurt. George, however, was hospitalized for several months and suffered permanent injuries. Appellant was prosecuted for all of the 1985 attacks and pled guilty to multiple counts of assault and one count of attempted murder on February 27, 1986, receiving an aggregate term of 69 to 138 months of imprisonment.

Appellant was incarcerated in New York until July 22, 1993, when he was released on parole. He then moved to Philadelphia and dated Tondra Dennis until she contacted his parole officer, at which point he was ordered to reside in New York under special conditions imposed by the New York Board of Parole. In April, 1996, approximately two months after Tondra's murder, Appellant met a woman named Tanesha Jacobs. Jacobs testified that she and Appellant became romantically involved and that there were no problems until July, 1997, when Appellant punched her in the face because she smiled at a group of men at a local beach. After that incident, Appellant continually harassed Jacobs and followed her around New York City. When she told him that the relationship was over, Appellant continued to stalk her and repeatedly threatened to kill her and her family. *See* N.T., Feb. 14, 2000, at 50–52. Jacobs was so unnerved by Appellant's behavior that she fled the United States and went to live with her mother in South America. Undaunted, Appellant telephoned her repeatedly in South America and threatened to harm her family if she did not return to New York. *Id.* at 53–55. Appellant eventually threatened to kill Jacobs's brother, Richard Jacobs, who died in January 1998.[9] Thereafter, when Tanesha Jacobs returned to New York to attend her brother's funeral, Appellant resumed stalking her, prompting her to file harassment charges against him.

Contrary to Appellant's position, the aforementioned evidence was not introduced in an attempt to portray him as a habitual criminal with a propensity for violent behavior.

9. At the time of trial, Appellant was not implicated in Richard's death. The circumstances surrounding Richard's funeral, however, are relevant to the case and are discussed, *infra*.

Rather, it was offered to establish that Appellant acted pursuant to a common plan or scheme. The testimony concerning Appellant's treatment of other girlfriends demonstrated repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon. In each instance, Appellant: (1) monitored his girlfriend's daily activities; (2) resorted to violence when his partner wanted to end a relationship or interacted with other men; (3) inflicted head or neck injuries with his fist, a handgun, or an edged weapon; and (4) harmed or threatened to harm members of his girlfriend's family or male acquaintances that he viewed as romantic rivals.[10] Given the shared characteristics of each relationship, the evidence fell within the purview of Pa.R.E. 404(b)(2). *See Commonwealth v. Einhorn*, 911 A.2d 960 (Pa.Super.2006), *appeal denied*, 591 Pa. 723, 920 A.2d 831 (2007) (evidence that accused murderer attacked two former girlfriends was admissible to show common scheme where each victim was choked or attacked with a blunt object when the defendant could not persuade the victim to continue the relationship, and the defendant contemporaneously described each incident in his diary); *Commonwealth v. Miller, supra* (evidence of prior rape and attempted murder was properly admitted to prove common scheme because the incident bore many similarities to subsequent homicides and aided in establishing the killer's identity); *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335 (1995) (upholding the admission of two prior rape-assaults in a first-degree murder trial where each victim was stabbed repeatedly in the upper body with a small knife, had brown

10. In a related issue, Appellant argues that the Commonwealth should not have been permitted to introduce evidence that he threatened Richard Jacobs and assaulted George and Robert Pratt because the Commonwealth failed to establish "a connection between this evidence and its trial theme that [Appellant's] violent response to rejection reached not only the women who rejected him, but also their family and friends." Brief for Appellant at 22. This claim is patently meritless, as it is obvious from the record that Richard Jacobs was the brother of Appellant's girlfriend, Tanesha Jacobs, and George Pratt was a friend of Appellant's girlfriend, Sandra Williams. Hence, those incidents were relevant and admissible to establish a common scheme.

shoulder-length hair, and was left in a remote, wooded location).

▉ Further, the evidence in question was relevant, reliable, and probative of guilt. The other incidents of abuse resulted in convictions and illustrated a distinct behavioral pattern that strengthened the prosecution's case, which consisted entirely of circumstantial evidence, as noted in our examination of the sufficiency of the evidence. *See supra* at 840–41; *Miller,* 664 A.2d at 1317 (acknowledging that prior crimes evidence played an important role where conviction was based on circumstantial evidence). Thus, although details of crimes committed in the course of other relationships were undoubtedly harmful to the defense, those events were significant because they proved that Appellant would use deadly force to prevent a woman from leaving him. These considerations, coupled with the fact that comprehensive limiting instructions were issued at trial, lead us to conclude that the probative value of the testimony exceeded its prejudicial impact.[11] *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d

**11.** At the beginning of the trial, the jury was instructed that evidence of other crimes could not be viewed "as showing the defendant is a person of bad character or a person of criminal tendencies from which you might be inclined to infer guilt." N.T., Feb. 8, 2000, at 103.

Thereafter, in its final charge to the jury, the trial court stated:

You have heard evidence tending to prove that the defendant was guilty of offenses for which he is not on trial. I am speaking specifically of the testimony that the defendant was convicted and sentenced for violent crimes in New York and that he has made certain statements which if believed by you would tend to prove that he has committed other offenses for which he is likewise not on trial here.

This evidence is before you for a limited purpose. It is offered for the purpose of tending to show that the defendant exercised a common scheme, plan or design. Common scheme, plan or design may show where ... two or more crimes are so related to each other that proof of one tends to prove the other.... This evidence must not be considered by you in any way other than for the purpose I have just stated. You must not regard this evidence as showing the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find the defendant guilty, it must be because you are convinced by the evidence that he committed the crime charged and not because you believe he is wicked or has committed other offenses.

75, 89 (2004) (limiting instructions weighed in favor of upholding decision to admit evidence of other criminal activity); *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1153 (2000) (same). Accordingly, this claim fails.

■■■ Appellant also contends that the trial court erred in admitting testimony concerning his relationship with Tanesha Jacobs and the death of her brother, Richard Jacobs, because: (1) those events occurred after Tondra's murder and were therefore irrelevant; and (2) the jury likely inferred that Appellant was responsible for Richard's death because the prosecutor elicited testimony that Richard died shortly after Appellant threatened his life.

At the outset, we reject the assertion that Appellant's relationship with Jacobs was wholly irrelevant. As noted above, Appellant's behavior toward Jacobs was consistent with his previous relationships with women and was admissible to establish a common scheme to aid in ascertaining the killer's identity.

■■■ Appellant is likewise not entitled to relief due to the Commonwealth's disclosure of Richard Jacobs's death. Appellant complains that the Commonwealth persuaded the trial court to admit testimony about Richard's funeral through an offer of proof that Tanesha and a second witness, Joyce King, would testify, consistent with their preliminary hearing testimony, that Appellant approached them at the funeral, and made threats, suggesting that he had murdered Richard and would do the same to Tanesha. At trial, however, Tanesha did not testify that Appellant claimed responsibility for her brother's death at his funeral, but rather that Appellant merely observed the funeral from an unknown vantage point, and King was unavailable to testify. As a result, Appellant now claims he is entitled to a new trial because Tanesha testified

N.T., Feb. 16, 2000, at 127–29. Thus, the court cautioned the jury that Appellant's prior convictions and misdeeds could be considered only for the legitimate purpose of establishing a common scheme, plan, or design. "The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 567 Pa. 272, 786 A.2d 961, 971 (2001).

that he threatened to kill Richard while she was living in South America, and the revelation of Richard's subsequent death implied that Appellant murdered Richard. Hence, Appellant maintains that the Commonwealth was erroneously permitted to introduce highly inflammatory evidence of uncharged criminal activity.

Appellant's claim fails, however, because there was no evidence admitted at trial linking Appellant to the death of Richard Jacobs. Further, the trial court did not abuse its discretion by admitting evidence of Appellant's relationship with Tanesha and evidence that her brother, Richard, had died. The prosecutor and the trial court both believed Tanesha would testify that Appellant claimed responsibility for Richard's death at the funeral, and the court ruled that such evidence was admissible to establish a common scheme because the inculpatory statement was allegedly made in conjunction with another threat intended to persuade Tanesha to re-establish her relationship with Appellant. When Tanesha's testimony failed to comport with the Commonwealth's offer of proof, Appellant's counsel did not move to strike the statements concerning Richard's death, request a mistrial, or seek a limiting instruction to minimize the potential for prejudice. Absent some form of contemporaneous request for relief, we decline to fault the trial court for refusing to grant a new trial on this basis.

■ Finally, Appellant argues that the Commonwealth should have been required to supplement the other crimes evidence with expert testimony because the trial court stated during pretrial motions that Appellant's aggressive behavior toward women demonstrated a "unique psychological profile," and the prosecutor expounded on that theme at various times when he commented on the inner workings of Appellant's mind. Brief for Appellant at 33. As Appellant fails to identify a single instance where trial counsel argued that such testimony was necessary and the trial transcripts do not contain any discussion of this issue, we cannot address it. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

## IV. Admission of Recorded Telephone Conversation

Next, Appellant asserts that the trial court erred in denying his motion to suppress a telephone conversation that he contends was recorded by Tondra without Appellant's consent in violation of the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), 18 Pa.C.S. §§ 5701–5727.[12] He asserts that, pursuant to *Commonwealth v. DeBlase*, 357 Pa.Super. 71, 515 A.2d 564 (1986), evidence derived from a violation of the Wiretap Act must be suppressed. Appellant also contends that the error was not harmless because the recording contained inflammatory material: he had used profane language, accused Tondra of cheating on him, and threatened to kill Tondra and her mother during the conversation.[13]

12. The Wiretap Act prohibits individuals from secretly intercepting, disclosing, or using any wire, electronic, or oral communications or evidence derived from those sources. *See* 18 Pa.C.S. § 5703. A violation subjects the perpetrator to criminal and civil penalties. *Id.; see also* 18 Pa.C.S. § 5725(a). The Act contains numerous exceptions and provides, *inter alia*, that a person may intercept communications without a court order if all parties to the communication give prior consent to the interception. *See* 18 Pa.C.S. § 5704(4).

13. The transcript of the recording provides as follows:

> Victim: What's today?
> Appellant: Why? You know what today is. What, you got your tape recorder on?
> Victim: I wish I could.
> Appellant: It don't matter, because if I step to my business, not a cop, ain't nobody in the fuckin' world gonna stop me . . .
> \* \* \*
> Appellant: . . . . You played the wrong mother fucker this time. And all I asked you was a[n] explanation. Why? You got the tape recorder on? It don't matter. Because [your] ass is gonna be dead, if I find out or somebody in law enforcement even looks at me wrong. Oh, your telephone bill is $278. And 50 [cents]. That's why you wanted $200. Lackland, Texas. July. You'll never change. That's the reason we have problems, you can't keep your fuckin' pants on. You ugly bitch.
> Victim: Thanks.
> Appellant: It don't matter. Go ahead. Run out the door. I'm still gonna lay. I'm gonna get you. . . . You've got all the signs of a cheating woman. They were all there. I'll fuck you up. . . . I'll murder your mother. Not your father. Your mother. Because I know it's gonna hurt then. I'm leaving you alive. I want you to feel it. You got that on tape? You got that on tape? Huh, bitch? That's all right. It don't matter. It don't matter at all. You want

The Commonwealth counters that Appellant expressly consented to the recording because he repeatedly stated during the conversation that he did not care if Tondra was recording the call. In light of this fact, the Commonwealth maintains that Appellant did not have a reasonable expectation of privacy in the conversation, and the trial court properly determined that the recording was admissible at trial.

Section 5704(4) of the Wiretap Act provides that in order for a person to intercept an oral communication lawfully, "all parties to the communication [must] have given prior consent to such interception." 18 Pa.C.S. § 5704(4). As noted, the transcript of the communication reveals that Appellant inquired multiple times whether Tondra was taping the conversation, and indicated that it did not matter to him whether the call was being recorded. Thus, the primary inquiry becomes whether Appellant's implicit consent to the recording of the communication *via* statements made during the conversation satisfies the language of the Wiretap Act requiring "prior consent" for the interception.

We need not resolve this issue, however, because even assuming for purposes of argument that there was a lack of prior consent that provided a basis for suppression, the recorded communication was cumulative of other properly-introduced evidence with substantially similar content. The jury heard testimony from multiple witnesses that Appellant threatened to kill Tondra, Tanesha Jacobs, and members of their respective families before he was charged with Tondra's murder. Moreover, the jury listened to several profanity-laced voicemail messages that Appellant left for Tondra in which he stated that she had made a terrible mistake by cheating on him and that he would eventually find her and retaliate. The threats conveyed in the voicemail messages were as disturbing as the recorded communication at issue, and Appellant concedes that the voicemail evidence was admis-

to go? Go. But I'll be there. When you least expect it. I'll be there....
N.T., Feb. 9, 2000, at 79.

sible.[14] *See* Brief for Appellant at 37 n. 5. Thus, the introduction of the recorded conversation constitutes, at most, harmless error, and does not merit relief. *See Commonwealth v. Housman*, 604 Pa. 596, 986 A.2d 822, 835 n. 7 (2009) (an improper evidentiary ruling is harmless if the erroneously-admitted evidence was cumulative of similar untainted evidence).

## V. Review of Jim James's Testimony

Appellant argues that the trial court abused its discretion in allowing a portion of the direct examination of prosecution witness Jim James, a pizzeria employee, to be read back to the jury during deliberations. The portion of testimony at issue involved James's statement that he observed Appellant accompany Tondra to a Philadelphia pizzeria a few hours before she was killed. Appellant claims this procedure unfairly benefitted the prosecution because James also testified that he observed Appellant in Philadelphia during the period in January, 1996, when Appellant was incarcerated in New York. Appellant maintains that since defense counsel's cross-examination of James cast significant doubt on the witness's credibility, that line of questioning was critical to the defense, and it should have been re-evaluated as well. Therefore, Appellant argues that a new trial is necessary because the review authorized by the trial court placed undue emphasis on an excerpt that refuted Appellant's alibi defense.

When a jury requests that a portion of recorded testimony be read aloud to refresh its memory, the matter is within the trial court's discretion. *Commonwealth v. Peterman*, 430 Pa. 627, 244 A.2d 723 (1968). If the court grants the request and the review does not place undue emphasis on the witness's testimony, no reversible error is committed. *Id.*

14. For example, the voicemail messages contained the following statements: (1) "[B]itch, as long as I breathe, you're gonna have problems." (2) "I know how much you love dear old moms. I know how much you love her. Don't worry. It's gonna be on." (3) "See you tomorrow, somewhere, eventually.... I always laugh last." and, (4) "You played me for another nigger ... the worst thing you could've ever did [sic] is play me for another nigger...." Commonwealth's Exhibit 1; *see* N.T., Feb. 9, 2000, at 79 (where audiotape was played for the jury).

In the case *sub judice*, the jury initially asked to re-examine James's entire testimony, but the court declined that request, stating that it would only permit review if the jury formulated "a precise question ... about [James's] testimony." N.T., Feb. 17, 2000, at 6. Ten minutes later, the jury requested "the specific date Jim James said he saw the defendant at Allegro's [pizzeria] in his trial testimony February 2000." *Id.*, at 7. Appellant's counsel urged the court to deny the second request as well, citing aspects of the cross-examination which showed that James's testimony was unreliable. Following oral argument, the court directed the court reporter to read for the jury a brief portion of James's direct testimony where he indicated that Appellant and Tondra entered his place of employment at approximately 9:00 p.m. on the night of the murder. The reporter complied and read approximately twenty lines verbatim from the notes of testimony.

Notwithstanding Appellant's claims to the contrary, the trial court did not commit reversible error in granting the jury's second request. James testified six days before the case went to the jury, and that six-day period included a weekend; thus, the court's decision to refresh the jury's recollection was reasonable. The court reporter did not place undue emphasis on the portion of the testimony that was read back to the jury, and, while the review did focus on a pivotal issue, it conformed to the jury's request for clarification on the final date that James claimed to have seen Appellant at the pizzeria. Moreover, contrary to Appellant's position, the failure to include defense counsel's cross-examination of the witness did not result in unfair prejudice. The cross-examination spanned several pages of testimony and established that James had difficulty recalling numerous events, including his initial contact with homicide investigators, and that he had pending criminal charges for drunk driving and unlawful possession of a firearm. Given the substantial amount of time that defense counsel devoted to those matters, it is highly unlikely that the jury forgot about them, and it is understandable that the trial court did not want to revisit James's entire testimony. Under these circumstances, we perceive no abuse of discretion. *Ac-*

*cord Commonwealth v. Toledo,* 365 Pa.Super. 224, 529 A.2d 480 (1987) (limited review of eyewitness's direct testimony was not an abuse of discretion).

### VI. Admission of Tondra Dennis's Calendar

 Appellant contends that the trial court erred in admitting a calendar that Tondra used to record bad acts committed by Appellant between August and October, 1995. Appellant claims the calendar contained inadmissible hearsay statements accusing him of burglary and other crimes that he could not refute because he never had an opportunity to cross-examine the declarant. He also complains that the prosecutor's closing argument exacerbated the prejudicial effect of the hearsay because it addressed events memorialized in the calendar, which suggested that the document was accurate.

Appellant cannot prevail on either claim. The record reveals that the calendar was mentioned briefly only to explain why Maureen Welsh, Appellant's parole officer, instituted parole revocation proceedings against him in October, 1995. The Commonwealth presented evidence that the calendar existed and triggered parole revocation proceedings, but did not read the contents of the calendar to the jury. As the trial court admitted the calendar for a legitimate purpose and none of the incriminating information contained in the exhibit was divulged when it was introduced, *see* N.T., Feb. 9, 2000, at 76–77, the trial court did not abuse its discretion. *See Commonwealth v. Palsa,* 521 Pa. 113, 555 A.2d 808, 810 (1989) (holding that certain out-of-court statements offered to explain the course of police conduct may be admissible because they are not offered for the truth of the matters asserted, but rather to show the information upon which the police acted; the trial court must balance the prosecution's need for the statements against any prejudice arising therefrom).

 Appellant's secondary complaint that the prosecutor inappropriately disclosed some of the hearsay information during his closing argument is waived because it was not raised in Appellant's Pa.R.A.P. 1925(b) statement, and the trial court did not address it. *Commonwealth v. Lord,* 553 Pa.

415, 719 A.2d 306, 309 (1998); *Commonwealth v. Hill,* 609 Pa. 410, 16 A.3d 484, 488 (2011).

## VII. Cautionary Instructions for Other Crimes Evidence

 Appellant argues that the trial court's cautionary instructions regarding evidence that was admitted to show a common scheme, plan, or design were "inadequate and inaccurate statements of law." Brief for Appellant at 51. The Commonwealth accurately points out that this issue is waived under Pa.R.A.P. 302(a) because Appellant's counsel did not object to either instruction. *See* N.T., Feb. 8, 2000, at 103; N.T., Feb. 16, 2000, at 127–129, 144.

## VIII. Absence of Voluntary Manslaughter Instruction

 Appellant also contends that the trial court erred in refusing to charge the jury on the offense of voluntary manslaughter, arguing that the evidence supported a finding that he killed Tondra in a rage after she ended their relationship. We disagree.

 The Crimes Code defines voluntary manslaughter as an unjustified killing committed while the perpetrator was acting under a sudden and intense passion resulting from serious provocation by the victim. 18 Pa.C.S. § 2503(a)(1).[15] This Court has held that for purposes of section 2503, "sudden and intense passion" encompasses emotions such as anger, rage, sudden resentment, or terror that renders the mind incapable of reason. *Commonwealth v. Browdie,* 543 Pa. 337, 671 A.2d 668 (1996). We have also held that "a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial." *Commonwealth v. Solano,* 588 Pa. 716, 906 A.2d 1180, 1190 (2006).

15. A second, distinct theory of liability provides that an intentional killing constitutes voluntary manslaughter if the perpetrator believed the killing was lawfully justified as an act of self-defense, but his belief is unreasonable. *See* 18 Pa.C.S. § 2503(b). The offense codified at Section 2503(b) does not merit any discussion here, as Appellant only requested that the jury be charged on "heat of passion" voluntary manslaughter.

In this case, the Commonwealth presented evidence that Appellant intentionally killed Tondra by shooting her in a vital area of the body after she caused him to be arrested and returned to New York for parole violations. Lucille Fauntleroy's testimony that the shooter argued briefly with the victim was inadequate to support a finding of voluntary manslaughter. *Cf. Solano, supra.* Moreover, Appellant denied involvement in the murder and presented an alibi witness who testified that he was in New York at the time of the shooting. Thus, the trial court correctly determined that Appellant was not entitled to the requested instruction. *See Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468 (1998) (trial court properly refused to give voluntary manslaughter instruction where defendant denied involvement in killing, called two alibi witnesses, and failed to offer any evidence that would have supported a finding of voluntary manslaughter).

## IX. Improper Argument

As background for this claim, we note that in the discussion of Issue III, relating to the admissibility of evidence of Appellant's prior criminal activity, we determined that the trial court did not abuse its discretion by admitting evidence of the death of Richard Jacobs, who was the brother of Appellant's former girlfriend, Tanesha Jacobs. Appellant now raises a distinct, but related claim that the prosecutor committed misconduct by suggesting in his guilt phase opening statements and closing arguments that Appellant was involved in Richard's death. As noted, Appellant harassed Tanesha and made death threats against her and her family. In its pretrial offer of proof, the Commonwealth relied upon preliminary hearing testimony that after the instant murder, Appellant threatened to kill Tanesha and Richard; that Richard subsequently died; and that at his funeral, Appellant boasted to Tanesha and her aunt, Joyce King, that he was responsible for Richard's murder and that Tanesha would suffer the same fate. *See* N.T., Feb. 8, 2000, at 74–76. At the time of Appellant's trial, neither Appellant nor any other suspect had been arrested or charged in Richard's murder.

As discussed previously, Appellant's counsel filed a motion *in limine* to bar introduction of evidence of other crimes, and asserted that any suggestion as to how Richard died was speculative. The trial court made a pretrial ruling that the testimony of Tanesha and Joyce King, relating to threats made by Appellant, was admissible to support the Commonwealth's common scheme theory of criminal liability. The trial court acknowledged that, under the circumstances, it was impossible for such statements to be introduced absent explanation that Appellant's threats were made at Richard's funeral. *Id.* at 75. The trial court, thus, concluded that the death of Richard could not be hidden from the jury. The trial court recognized the potential for prejudice, but expressed its belief that a jury instruction would cure any harm. Before opening statements, the trial court instructed the jury, *inter alia,* that statements made by the attorneys are not evidence. N.T., Feb. 8, 2000, at 33, 37, 40.[16]

During the Commonwealth's opening statement, the prosecutor asserted:

> You will see that Ms. Jacobs had a romantic interest with [Appellant], but there began the stalking, the isolation, the quarantining of the woman, the physical conduct toward the woman. A man looks at her, she gets hit and thumped to the point where this young woman had to flee the country to her native country of Guyana where she was then phone stalked by [Appellant] and was threatened that if she did not return to him that he would kill her brother [Richard Jacobs]. A few days later, Ms. Jacobs had to prepare for her brother's funeral and she came back.

*Id.,* at 56.

Defense counsel immediately objected and asked the trial court to strike the comments from the record. The trial court sustained the objection. Upon the prosecutor's interjec-

16. The court further explained to the jury, "[y]ou should not assume that an attorney will prove what they say they will prove, merely that this is what they desire to do during the course of the trial. You will determine at the end of this proceeding what facts have in actuality been proven." *Id.* at 41.

tion that the comments were subject to the jury instruction, however, the trial court declined to strike the prosecutor's statements, and instead deferred to the general jury charge. Subsequently, defense counsel reiterated the objection and requested a mistrial, on which the trial court reserved judgment. The trial court never revisited Appellant's request for a mistrial, and acted only to sustain Appellant's objection. Thereafter, the prosecutor did not reference in opening statements, expressly or by implication, the cause of Richard's death.

At trial, consistent with her preliminary hearing testimony, Tanesha testified that, after her relationship with Appellant ended, he continued to harass her, which caused her to flee to her native Guyana, South America, to live with her mother. Tanesha explained that Appellant called her multiple times a day in Guyana and, during those conversations, threatened to kill her and her family. Tanesha's testimony suggested that she was out of Appellant's reach in Guyana, unlike Richard, who was her only immediate relative living in the United States. She asserted that when Richard died one week after Appellant threatened his life, Tanesha returned to the United States. The Commonwealth introduced no evidence that Richard was murdered, or that Appellant was, in fact, responsible for his death. N.T., Feb. 14, 2000, at 50–84. Furthermore, neither Tanesha nor Joyce King, who was unavailable for trial, substantiated the Commonwealth's pretrial offer that, at Richard's funeral, Appellant threatened Tanesha and boasted about having killed her brother.

Nevertheless, after the trial court had sustained Appellant's objection to the reference made during opening statements, the prosecutor again attempted to connect Appellant to Richard's death during closing argument, this time in a more overt manner. The prosecutor stated in his summation:

[T]he phone stalking starts again in Guyana of all places a couple times a day. I will kill you. I will kill your family. I will kill—it goes on and on. Finally, it gets to January of 1998, if you don't come home I will kill your brother

Richard. I can't come home. You're abusive. Bang. Richard is dead, and she has to come home for the funeral. N.T., Feb. 16, 2000, at 106–07.

Significantly, Appellant's counsel did not lodge an objection to this comment, and did not request that the trial court rule upon his prior motion for a mistrial, which the court had reserved following opening statements. When closing argument was concluded, the court cautioned the jury that evidence of Appellant's prior offenses should be considered only for the limited purpose of establishing that he exercised a common scheme, plan, or design. *Id.* at 127–28.

Appellant argues that although no direct accusations were made, the prosecutor's comments during opening and closing remarks suggested impermissibly that Appellant killed Richard. He contends that this implication was unsupported by the record, exceeded permissible oratorical flair, and created a fixed bias and hostility in the jury's mind, which prevented the jury from rendering a fair verdict. Appellant maintains that "[e]ven if the trial court removed the prejudice of the opening statement by sustaining trial counsel's objection, it later sat immobile when the prosecutor returned to this theme in summation." Brief for Appellant at 57. He concludes that the prejudice resulting from the prosecutor's misconduct was significant, as it permitted the Commonwealth to obtain a conviction based on "an inflammatory allegation of subsequent murder unsupported by the evidence." *Id.*

The Commonwealth responds that Appellant's claim is meritless because the prosecutor did not suggest, either in opening or closing statements, that Appellant murdered Richard. Rather, it contends, the prosecutor recounted, in accordance with the evidence, that Appellant physically harmed Tanesha and threatened her family, and that Tanesha had to return from Guyana to attend her brother's funeral. It asserts that the prosecutor's comments did not suggest that Richard had been murdered, let alone that Appellant killed him. The Commonwealth further emphasizes that the trial court sustained Appellant's objection to the prosecutor's opening state-

ment, and that Appellant failed to lodge an objection to the prosecutor's similar sentiments in closing arguments, thereby waiving the issue.

The trial court denied Appellant relief. The court took the position that it had prohibited any reference to Richard's murder, and sustained Appellant's objection to the prosecutor's reference during opening statements that Richard died a few days after Appellant threatened his life. Further, the court emphasized that the jury was properly instructed that the opening statements were not evidence, and that Appellant did not assert that the jury did not follow that instruction.

 We begin by acknowledging that a claim of prosecutorial misconduct either sounds in a specific constitutional provision that the prosecutor allegedly violated, or, more commonly, implicates Fourteenth Amendment due process. *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 28–29 (2008). The touchstone of due process is the fairness of the trial, rather than the culpability of the prosecutor; consequently, it is the trial court's ruling on the defendant's objection to the prosecutor's allegedly improper statement that is reviewable on appeal, and not the prosecutor's underlying misconduct. *Id.* at 29. Nevertheless, the prosecutor's statements must be scrutinized in order to address the propriety of the trial court's ruling. It is well-established that "[c]omments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict." *Commonwealth v. Bryant*, 620 Pa. 218, 67 A.3d 716, 727 (2013) (citing *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 307 (2011)). A prosecutor's remarks in opening statements must be fair deductions from the evidence the Commonwealth intends to offer, which the prosecutor believes, in good faith, will be available and admissible at trial. *Commonwealth v. Fultz*, 478 Pa. 207, 386 A.2d 513, 516 (1978). In closing arguments, a prosecutor may comment on the evidence and any reasonable inferences aris-

ing from the evidence. *Commonwealth v. Daniels,* 537 Pa. 464, 644 A.2d 1175 (1994).

 Regarding Appellant's claim of misconduct in the prosecutor's opening statement, we find some force to the contention that the prosecutor's opening remarks suggested impermissibly that Appellant was responsible for Richard's death. Although the Commonwealth is correct that the prosecutor did not state expressly that Richard was murdered or that Appellant killed him, the plain import of the prosecutor's statement (that Appellant threatened Richard's life and that he died a few days later) came close to suggesting Appellant's involvement in Richard's demise. Indeed, the trial court purportedly recognized this when it sustained Appellant's objection.

Nevertheless, we conclude that the prosecutor's comments did not prejudice the jury by preventing it from weighing the evidence objectively and rendering a fair verdict. The prosecutor's references were brief, and, as noted, did not reveal explicitly the nature of Richard's death. By sustaining Appellant's objection, the trial court cut off any further suggestion regarding the cause of Richard's death, and refocused the prosecutor's remaining remarks on threats Appellant had made to Tanesha. Additionally, the trial court cautioned the jury that the prosecutor's statements did not constitute evidence and that evidence of Appellant's prior offenses should be considered only for the limited purpose of establishing that he acted pursuant to a common scheme, plan, or design. We presume the jury followed this instruction. *Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001) (holding that the law presumes that the jury will follow the court's instructions). Because Appellant has failed to demonstrate that the prosecutor's comments formed in the jurors' minds a fixed bias and hostility toward him such that they could not weigh the evidence objectively and render a fair verdict, he is not entitled to the grant of a new trial on his claim of prosecutorial misconduct during opening statements.

■■■ Appellant's claim that the prosecutor committed misconduct during closing arguments is more troubling, as the prosecutor's implication that Appellant killed Richard was more explicit, suggesting that after Appellant's threats—"Bang"—Richard was dead. This claim, however, is waived as Appellant's counsel did not raise contemporaneous objections to either the prosecutor's summation or the trial court's instructions regarding the same, nor did he request a mistrial. *See* Pa.R.A.P. 302(a) (providing that "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Contrary to Appellant's argument, it was not the trial court that "sat immobile" when the prosecutor purportedly implicated Appellant in Richard's death; it was Appellant's counsel.

■■■ Appellant also complains that the prosecutor made inappropriate statements during his guilt-phase closing argument that invited the jury to draw a negative inference from Appellant's failure to testify at trial. This claim is also waived pursuant to Pa.R.A.P. 302(a) because Appellant's counsel did not object to that portion of the prosecutor's argument.

### X. Challenges to Philadelphia's Capital Sentencing System

■■■ Appellant argues that his death sentence is infirm because it was the product of pervasive racial discrimination that affects death penalty trials conducted in Philadelphia County. Relying on a study of capital murder prosecutions compiled by University of Iowa Professors David Baldus and George Woodworth, Appellant asserts that his sentence violates the Eighth and Fourteenth Amendments to the United States Constitution and the prohibition against arbitrary death sentences codified at 42 Pa.C.S. § 9711(h)(3)(i). Appellant maintains that the Baldus/Woodworth study constitutes "overwhelming proof" that African Americans prosecuted in Philadelphia for similar murders receive the death penalty at a substantially higher rate than defendants of other races, which shows a "constitutionally impermissible risk of racial bias." Brief for Appellant at 75.

We are familiar with the Baldus/Woodworth study and, in reviewing similar claims, have consistently refused to invalidate death sentences where, as here, the defendant's argument is premised on "generalized allegations of discrimination or statistics showing a disproportionate application of the death penalty to members of certain groups." *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 822 (2007). The general conclusions drawn by Professors Baldus and Woodworth based on a statistical analysis of capital murder trials conducted in Philadelphia County between 1978 and 2000 are insufficient to establish that a specific jury imposed the death penalty in a discriminatory manner; in order to prevail on a claim of this nature, the defendant must prove that the jury **in his case** acted with discriminatory intent. *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)) (emphasis in original).

Appellant asserts that he met his burden of proof because Professor Baldus testified at a post-trial evidentiary hearing that he reviewed this case and 337 other capital cases where Philadelphia juries weighed aggravating factors against mitigating factors, and a statistical analysis indicated that "there is substantial, consistent and statistically significant discrimination against African–American defendants." N.T., Dec. 13, 2004, at 70. We disagree. The mere fact that Professor Baldus added Appellant's case to the cross-section he analyzed for the defense does not establish that discrimination occurred at this trial. Professor Baldus testified that statistics show African–American defendants in general are subjected to racial discrimination in capital cases where aggravating and mitigating factors are found. As there is no evidence that this particular jury imposed the death penalty in a discriminatory manner, Appellant's argument fails. *Rios, supra.*

## XI. Absence of a *Simmons* Instruction

Appellant also contends that the trial court erred in refusing to instruct the jury during the penalty phase that in Pennsylvania, imposition of a life sentence means that the defendant will serve the rest of his life in prison without the

possibility of parole. Appellant claims the court's ruling violated his due process rights under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), and that a new penalty hearing is warranted.

In *Simmons*, a plurality of the United States Supreme Court opined that when a defendant's future dangerousness is placed at issue during the penalty phase of a capital trial, and state law prohibits the defendant from being released on parole, "due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156, 114 S.Ct. 2187. A majority of the High Court reiterated this principle in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), stating that when a capital defendant's future dangerousness is at issue and state law precludes the defendant from being paroled, the jury must be advised of the defendant's parole ineligibility through a jury instruction or closing arguments of counsel. *Id.* at 39, 121 S.Ct. 1263. *See also Kelly v. South Carolina*, 534 U.S. 246, 248, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) (recognizing that the United States Supreme Court reiterated the *Simmons* holding in *Shafer*). In the case at bar, the prosecutor placed Appellant's future dangerousness at issue during the penalty phase by emphasizing that Appellant has a significant history of felony convictions for violent acts against men and women and observing that he "is a man who is dangerous to others on a repeat pattern basis." N.T., Feb. 22, 2000, at 57. However, the prosecutor prefaced those remarks by stating that the jury had to decide "whether or not [Appellant] should go to jail for the rest of his life or go on death row. . . ." *Id.* at 51. Appellant's counsel subsequently clarified that Appellant would never be released from prison if given a life sentence, stating in pertinent part:

And the other choice you can make here, ladies and gentlemen, is a period of life in prison. Life in prison without parole. Life in prison where the person that serves the life in prison will start the sentence going to a cold cell maybe half the size of this jury box, maybe two-thirds of the size of this jury box on a metal slab with a cot. Maybe a

cold metal toilet, and if he's lucky maybe a cold metal sink with bars and cement walls within feet of him wherever he is inside that cell.

And a life sentence, life in prison without parole, says that that's where the sentence will start and that's where the natural life of Lance Arrington will end. In a cell just like that somewhere in the hills in the mountains of Pennsylvania.... I am asking you to impose in fact a very harsh, a very severe sentence of life in prison because it's without parole. That means to the end of his natural life in a small cold cell like that.

As I said to you that in Pennsylvania the imposition of a life sentence is life without parole. You know and you hear, and before I became a lawyer I recall hearing I guess out in California, you know, once in a while you hear this bizarre notion that Charles Manson comes up for consideration of parole every once in a while. You think, wait a second. That's crazy. See, in Pennsylvania that doesn't apply. See, in Pennsylvania, life in prison is life without parole. This man will never come up for parole, will never consider him for parole to the street. Never.

*Id.* at 67–69.

In light of counsel's lengthy explanation of the meaning of a life sentence, which clearly conveyed that Appellant would be ineligible for parole under Pennsylvania law, we find that due process was satisfied, and no instruction was necessary. *Shafer, supra.*

## XII. Ineffectiveness Claims

 Appellant asserts four claims of ineffective assistance of counsel challenging his attorney's performance during the guilt phase of trial, and one claim challenging counsel's performance during the penalty phase of trial.[17] Pursuant to our

17. The guilt phase ineffectiveness claims allege that trial counsel was ineffective for failing to: (1) conduct a pretrial interview of Commonwealth witness Jim James; (2) request a specific jury instruction regarding the potential bias of Jim James; (3) object to the trial court's cautionary instruction regarding evidence of other criminal activity; and (4) object to the prosecutor's comments regarding Appellant's alibi

recent decision in *Commonwealth v. Holmes*, 621 Pa. 595, 79 A.3d 562 (2013), we decline to address these ineffectiveness claims, and dismiss them without prejudice to Appellant's right to pursue them, along with any other appropriate issues, on collateral review.

We recognize that when Appellant was represented by new (and current) counsel at the post-verdict stage, this Court had not yet issued its ruling in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), setting forth the general rule that claims of ineffective assistance of counsel are to be deferred to collateral review under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546. Thus, new counsel was required to raise claims of counsel ineffectiveness at that time, upon pain of waiver. As a result, Appellant raised several ineffectiveness claims in post-verdict motions. The ineffectiveness claims, however, were litigated after *Grant* was decided, as the trial court conducted hearings on the post-verdict motions in 2004–2005, and issued its Rule 1925(a) opinion in 2007, disposing of the claims on the merits as if they were a proper component of Appellant's direct appeal.

We recently held in *Holmes* that claims of ineffective assistance of counsel litigated after our decision in *Grant* are not generally a proper component of a defendant's direct appeal. In *Holmes*, this Court reaffirmed the general rule of deferral established in *Grant*, and disapproved of expansion of the so-called Bomar [18] exception, which allowed for the presentation of ineffectiveness claims on direct appeal if the trial court held an evidentiary hearing and disposed of the ineffectiveness claims in its opinion. This Court in *Holmes* limited the *Bomar* exception to its pre-*Grant* facts. We further recognized two exceptions to the *Grant* deferral rule, both falling within the discretion of the trial court. First, we held that trial courts retain discretion, in extraordinary circumstances, to entertain a discrete claim of trial counsel ineffectiveness if the claim is both apparent from the record and meritorious,

defense. Appellant's penalty phase ineffectiveness issue challenges trial counsel's failure to present mental health mitigation evidence.

18. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003).

such that immediate consideration best serves the interest of justice. Second, we held that trial courts also have discretion to entertain prolix claims of ineffectiveness if there is a good cause shown and the unitary review thus permitted is accompanied by a knowing and express waiver by the defendant of the right to pursue a first PCRA petition.

The trial court did not have the benefit of our decision in *Holmes* and, thus, did not engage in an analysis as to whether Appellant's claims of ineffective assistance of counsel fell into one of the two exceptions to the general rule of deferral. Under these circumstances, and to afford Appellant the opportunity to pursue all issues of ineffective assistance of counsel, and not merely the ones set forth in this direct appeal, we dismiss the ineffectiveness claims without prejudice to Appellant to raise them in a subsequently filed PCRA petition. *See Accord Commonwealth v. Stollar,* 624 Pa. 107, 84 A.3d 635, 2014 WL 241864 (2014) (Castille, C.J. Concurring) (where a majority of the Justices agreed that the determination of whether an ineffectiveness claim falls within an exception set forth in *Holmes* is for the trial court to determine in the first instance, and ineffectiveness claims raised in a direct appeal litigated after *Grant* should be dismissed without prejudice to allow the appellant to raise them in a subsequently filed PCRA petition).

## XIII. Statutory Review of Death Penalty Verdict

 Having determined that Appellant's convictions are sustainable and his claims of error do not prevail, we should affirm the death sentence unless we find that: (i) the sentence was the product of passion, prejudice, or any other arbitrary factor, or (ii) the evidence does not support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3). Based on our careful review of the record, we conclude that the sentence was not the product of passion, prejudice, or any other arbitrary factor; rather, it stemmed from properly-admitted evidence that Appellant intentionally killed Tondra Dennis by shooting her in the neck with a handgun. We also conclude that the evidence was

sufficient to support the lone aggravating circumstance found by the jury, as Appellant's prior convictions were adequate to establish a significant history of felony convictions involving the use or threat of violence to the person.[19] *See* 42 Pa.C.S. § 9711(d)(9).

For the foregoing reasons, we affirm the judgment of sentence. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S. § 9711(i).

Justices EAKIN, TODD, McCAFFERY, and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice STEVENS joins.

Justice SAYLOR files a dissenting opinion.

## CONCURRING OPINION

Chief Justice CASTILLE.

I join the Majority Opinion, subject to the following qualifications respecting two of the issues raised on appeal. The issues implicate appellant's claims premised upon the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), 18 Pa.C.S. §§ 5701–5782, and upon *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality).

### Wiretap Act Claim

First, respecting appellant's claim deriving from the Wiretap Act, the Majority does not address the dispute between the parties over whether appellant implicitly consented to the recording of his telephone conversation by the victim, Tondra Dennis. The Majority instead dismisses the claim on harmless error grounds. *See* Majority Op. at 530–35, 86 A.3d at

19. The Commonwealth presented evidence during the penalty phase that Appellant pled guilty to several felonies in the state of New York, including arson, assault with intent to cause serious injury, and attempted murder. *See* N.T., 2/22/00, at 12–13.

846–48. I join in the harmless error analysis, but write to address other aspects of appellant's claim, because, in my view, the decisional law in this area is problematic and because it is not difficult to imagine a situation similar to that before us recurring.

Generally, the Wiretap Act criminalizes the intentional interception, disclosure or use of wire, electronic or oral communications. 18 Pa.C.S. § 5703. Section 5704 lists exceptions to the prohibition of interception and disclosure of communications. 18 Pa.C.S. § 5704. Relevant here, the statute also prohibits evidentiary disclosure of the contents of any wire communication in a court proceeding. 18 Pa.C.S. § 5721.1(a). An "aggrieved person," party to a court proceeding, "may move to exclude" from evidence the contents of a wire communication, on the ground that it was intercepted by law enforcement without prior approval, see 18 Pa.C.S. §§ 5712–5713.1, except where a Section 5704 exception applies. 18 Pa.C.S. § 5721.1(b). According to one exception, "[i]t shall not be unlawful and no prior court approval shall be required under [the Wiretap Act] for ... [a] person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4). A "person" includes an individual, whether or not affiliated with law enforcement. See 18 Pa. C.S. § 5702.

Appellant's argument proceeds on the assumption that Section 5721.1(b) requires automatic suppression of evidence for a non-governmental violation of the Wiretap Act. Appellant cites as settled law *Commonwealth v. DeBlase,* 357 Pa.Super. 71, 515 A.2d 564 (1986), in support of this result. In *DeBlase,* the Superior Court summarily held that a conversation between a criminal defendant and the victim's wife, recorded by the victim without the consent of the participants, was properly suppressed because the recording violated the Wiretap Act. *Id.* at 566 (citing 18 Pa.C.S. § 5721 (repealed)); *but see Commonwealth v. Louden,* 536 Pa. 180, 638 A.2d 953 (1994) (applying constitutional standard, *i.e.,* reasonable expectation of privacy, to decide whether suppression proper under repealed Section 5721). The Section 5721 analysis of the Superi-

or Court in *DeBlase* was brief, conclusory, and, in my view, unpersuasive. Moreover, while the subject matter of Section 5721 was reprised in Section 5721.1, the plain language of the two provisions is not identical. This Court has not yet had an opportunity to interpret Section 5721.1, and does not have the benefit of adversarial presentations in this case concerning this subject in order to decide the issue.

Section 5721.1(b) provides that an aggrieved person "may move to exclude" evidence on specifically enumerated grounds; the provision purports to dictate the exclusive judicial remedy for a non-constitutional violation of the Wiretap Act. *See Commonwealth v. Spangler*, 570 Pa. 226, 809 A.2d 234, 240 (2002) (citing 18 Pa.C.S. § 5721.1(b), (e)). The Wiretap Act thereby would provide greater protection than the Fourth Amendment, grounded in Pennsylvania notions of privacy. "Because of this privacy concern, the provisions of the Wiretap Act are strictly construed." *Id.* at 237. Two obvious questions are implicated: (1) did the General Assembly intend that relevant, probative, accurate, and reliable evidence, secured without governmental conduct, much less governmental misconduct, should be excluded in criminal prosecutions; and (2) if so, is the judicial branch obliged to defer to that evidentiary directive in managing criminal trials? The *DeBlase* black letter rule may offer ease of application, but it does not adequately address these questions.

Respecting the first question, I would not be too quick to assume a universal and rote exclusionary rule absent proof that this was the clear intent of the General Assembly. *Cf. U.S. v. Caceres*, 440 U.S. 741, 751 n. 13, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Section 5721.1(b), specifically, appears to be concerned primarily, if not exclusively, with governmental interceptions of communications without prior approval, rather than with private interceptions. This statutory construct is logical, because civil actions are available to vindicate privacy interests affected by purely private action. Non-governmental recordings, such as the victim's here, are only obliquely implicated by the statutory exclusionary rule because of the reference to the exceptions in Section 5704. *See* 18 Pa.C.S.

§ 5704(4). The obvious purpose of the reference to Section 5704 in Section 5721.1 is to signal that the statutory exclusionary rule is not authorized if one of the exceptions to the prohibition of interception and disclosure applies. Any intent of the General Assembly to extend the statutory exclusionary rule beyond constitutional requirements to apply to private conduct requires at best circuitous construction by the Court. The intent is certainly not explicit.

The Wiretap Act criminalizes the conduct of private parties. But, simply because the General Assembly imposed sanctions on private persons intercepting communications it is not automatically true that the General Assembly intended to penalize the government, and the people, in criminal prosecutions, if the government afterwards lawfully obtained the private recording. It is also counter-intuitive that suppression would be a rote remedy in cases of non-governmental interceptions, given that such actions are not of constitutional magnitude. *Cf. Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81, 87–88 (1988) (warrantless government interceptions of wire communications, with consent of one party, do not violate either Fourth Amendment of U.S. Constitution or Article I, Section 8 of Pennsylvania Constitution) (citing *Caceres, supra* (failure of IRS agent to follow agency regulations before recording conversations with taxpayer did not require suppression of recordings in prosecution of taxpayer for bribing agent)).

Respecting the second question, in my view, it is not self-evident that the General Assembly can proscribe the admission by statute of evidence otherwise determined relevant and admissible by a court. It is one thing for the General Assembly to accept and codify a common law evidentiary rule, such as privilege rules. But, it is quite another matter to proscribe a legislative rule of evidence, particularly one which impedes the core truth-finding function of a criminal trial, and without advancing a constitutional value. In short, until the Court passes upon the question, I would caution courts to view *DeBlase* with skepticism.

Turning to the question disputed by the parties, but not reached by the Majority, in my view, appellant manifested his

consent to the recording of his telephone call to the victim, during the course of that call. Section 5704(4) requires the "prior consent" to interception of all parties to the communication but does not specify that the consent must be explicit in response to explicit disclosure that the interception is in progress. *See Commonwealth v. Proetto*, 771 A.2d 823, 830–31 (Pa.Super.2001), *aff'd* 575 Pa. 511, 837 A.2d 1163 (2003) (person may consent by conduct to recording of message). The totality of circumstances, as evident from the parties' conversation—which the Majority reproduces in footnote 13—shows that appellant was well aware that the victim may have been taping the conversation and, nonetheless, he continued to make statements rather than disconnect the phone call. Appellant assented to the recording by repeatedly disavowing any expectation or interest in keeping the conversation with the victim private and expressing disinterest, in no unclear terms, in whether he was being recorded. In my view, appellant gave implied consent to the interception of his telephone conversation with the victim. The trial court did not err on this basis in admitting the recording of the parties' conversation, containing highly probative, relevant evidence. *See* Tr. Ct. Op., 8/7/2008, at 13. Indeed, no cognizable value would be forwarded by exclusion of the recording especially where, as here, there was evidence that appellant was the cause of the victim's unavailability, which prevented the victim from relaying to the jury the threats he unquestionably made during that phone call.

### *Simmons* Claim

Second, I join the Majority's analysis and its rejection of appellant's *Simmons* claim. I agree with the Majority that trial counsel's argument concerning mandatory sentences of life without possibility of parole ("LWOP") more than conveyed the current nature of an LWOP sentence. Counsel's argument was incorrect, however—and to appellant's benefit—to the extent that it declared that an LWOP sentence means there is no prospect of release. The fact remains that an LWOP sentence can be commuted; the General Assembly could redefine the punishment to allow for parole; and the

U.S. Supreme Court's Eighth Amendment jurisprudence, which is in a dynamic and changing phase favoring criminal defendants, *see, e.g., Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (banning imposition of mandatory LWOP on juvenile murderers) and *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (banning imposition of LWOP on juvenile offender who did not commit homicide), could someday "evolve" to dictate that LWOP sentences are unconstitutional for all murderers. *See Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 260–61 (2000) (Castille, J., concurring and dissenting).

Justice STEVENS joins this concurring opinion.

### DISSENTING OPINION

Justice SAYLOR.

The majority posits that the panoply of other-bad-acts evidence presented by the Commonwealth was not introduced to establish Appellant's propensity for violence, but rather, was offered to establish his identity as the killer. *See* Majority Opinion, at 527–28, 86 A.3d at 844. However, as the decisional law gravitates further and further away from the centering ground of signature crimes, *see* 1 McCormick, Evidence § 190 (4th ed. 1992), the identity/propensity distinction devolves to a matter of semantics. It may well be, as the majority appears to suggest, that Appellant's past violent conduct directed toward women was a key aspect of the prosecution. *See* Majority Opinion, at 527–30, 86 A.3d at 844–45. Nevertheless, upon review of this record, I am unable to support the majority's conclusion that the Commonwealth's case against Appellant was not, in material part, character and propensity based.