J.S26045/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
                :         PENNSYLVANIA
          Appellee      :
                :
      v.           :
                :
                :
KAREEM HOGAN,         :
                :
         Appellant     :    No. 2723 EDA 2013

Appeal from the Judgment of Sentence August 27, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0003016-2012

BEFORE: BENDER, P.J.E., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:        **FILED APRIL 13, 2015**

     Appellant, Kareem Hogan, appeals from the judgment of sentence of twenty-six to fifty-two years' imprisonment imposed after a jury found him guilty of murder of the third degree,[1] conspiracy,[2] and carrying firearms in public in Philadelphia.[3]  Appellant claims the evidence was insufficient to sustain the conspiracy conviction and the trial court erred in refusing to instruct the jury on voluntary manslaughter—heat of passion.  In nine

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. § 6108.

additional arguments, Appellant asserts the Commonwealth committed

prosecutorial misconduct by suggesting he threatened witnesses, referring to

his pretrial incarceration, arguing inferences not supported by the trial

evidence, and mischaracterizing the issue of self-defense.[4]  We are

constrained to affirm.

On January 6, 2012, Appellant was arrested and charged with general

homicide, conspiracy, and related weapons violations for the October 27,

2011 shooting death of Joel Negron ("decedent").[5]  Appellant proceeded to a

jury trial that commenced on June 25, 2013.  The trial court summarized the

evidence presented at Appellant's jury trial.[6]

> On October 27, 2011, at approximately 6:30 p.m., in
> response to a radio call, Police Officer Antonio Smith, upon
> arrival at Waterloo and Westmoreland Streets in
> Philadelphia, saw [the decedent] lying on the sidewalk of
> Westmoreland Street.  Police Officer Smith examined [the
> decedent's] injuries, noting multiple bullet wounds.  The
> officer did not observe a weapon on or about [the
> decedent]'s body.  Within minutes an ambulance arrived
> and took [the decedent] to the hospital.
>
> At 7:17 p.m., [the decedent] died at Temple University
> Hospital.  Dr. Edwin Lieberman, an Assistant Medical
> Examiner and an expert in forensic pathology, concluded
> that [the decedent] died of gunshot wounds to his back
> and torso.  [The decedent] had suffered three gunshot
> wounds.  One shot was to his upper back, which fractured

---

[4] As noted below, we have reordered Appellant's questions in this appeal.

[5] Appellant was eighteen years old at the time of the incident.  Appellant's codefendant Brandon Sanabria was seventeen years old.

[6] Sanabria entered a negotiated plea on June 20, 2013.

his sixth rib and hit his right lung. One shot was to his upper left back, which fractured his sixth rib and hit his left lung. One shot was to his front right side of the hip which exited through the right buttock.

Police Officer Robert Flade of the Crime Scene Unit arrived at the scene at 8:08 p.m. Officer Flade recovered seven fired cartridge casings from the scene: five .25-caliber fired cartridge casings and two .40-caliber fired cartridge casings.

According to Police Officer Raymond Andrejczak, an expert in firearms identification, the five .25-caliber fired cartridge cases recovered from the scene were fired from the same firearm. The two .40-caliber fired cartridge casings were fired from a separate firearm. The two projectiles recovered from [the decedent]'s body by the medical examiner's office were both .25-caliber and fired from the same firearm.

At trial, many of the witnesses in this case gave testimony that was inconsistent with the statements they gave to police. On November 25, 2011, Johnny Walker gave a statement to police. Walker explained that he was walking in the area of Front and Westmoreland Streets when he heard yelling and saw [Appellant] and Brandon Sanabria. [The decedent] and a friend were walking from Waterloo and Westmoreland Streets towards Hope Street. [The decedent] said "there's that bitch ass nigga right there." [Appellant] responded "[o]h, he [is] pulling." [Appellant] and Sanabria pulled out their guns and started shooting at [the decedent. The decedent] said "[t]hat's all your bitch ass nigga got?" [The decedent] walked to Waterloo and Westmoreland Street and then fell on the sidewalk.

The day after the murder, Sanabria showed Walker a silver gun and asked if he wanted to buy it. Walker refused. Walker also told the police that he always saw [Appellant] carrying a black .40-caliber firearm on his

hip.[7]   At trial, Walker recanted, denying that gave the answers in his statement.

On November 26, 2011, Fredrick Miller, [Appellant's] [stepfather], gave a statement to police.  In the statement, Miller explained that on the night of the murder, he was at home at 3335 Waterloo Street when he heard about seven gunshots.  [Appellant] and Sanabria ran into the house and put guns on the floor.  Miller told [Appellant] and Sanabria to leave and they did.  Monte Hogan, Miller's stepson, put the guns in a bag in the corner.  About two hours later, Sanabria called and informed Monte Hogan that he was sending a woman to retrieve the guns.  A woman called Goida arrived and took the guns to Sanabria's house.

The next day, [Appellant] came to Miller's house and told him that he had been walking with Sanabria on Westmoreland Street when he saw [the decedent] walking with Edwin Laboy and Onehida Rodriguez.  [The decedent] told [Appellant], "there goes those bitch niggas from Waterloo."  [The decedent] was trying to reach for a weapon, so [Appellant] pulled out his .40-caliber and tried to shoot, but it jammed.  Sanabria then pulled out his .25-caliber firearm and shot [the decedent].  [Appellant] explained that the reason they were arguing with [the decedent] was that Yaniz Estrada had a conflict with people from Mascher Street about selling PCP on Waterloo Street.  [Appellant] and Sanabria didn't want Estrada selling PCP on the block because they sold PCP on Mascher Street.

At trial, although Miller confirmed that himself, [the decedent], and Estrada sold PCP in the area of Waterloo and Westmoreland Streets, he denied that [Appellant] and

---

[7] Walker previously gave a statement to police on November 15, 2011.  A detective read into the trial record his summary of the November 15th statement, in which Walker described that the decedent's friend was reaching into his jacket.  Based on that statement, Appellant suggested at trial that either the decedent or Laboy was reaching for a weapon when Appellant and Sanabria shot.  We note, however, the November 15th statement was not contemporaneously transcribed or signed by Walker.

Sanabria ran into hi[s] home with guns after the murder. Instead, he said that on the night of the murder after he heard gunshots he saw a group of people from Mascher and Mutter Streets yelling and running around.

On November 26, 2011, Rafael Torres-Burgos gave a statement to police describing that on the night of the murder he was walking down Westmoreland Street to pick up his girlfriend when he heard arguing and yelling. Torres-Burgos heard about three gunshots and saw [Appellant] who was holding a gun and Sanabria running from Waterloo Street towards Howard and Hope Street.

At trial, Torres-Burgos denied seeing [Appellant] and Sanabria shoot [the decedent]. Torres-Burgos testified that he was in his home when he heard two or three gunshots. Torres-Burgos ran outside and saw [the decedent] laying on the ground and two people he did not recognize running away.

On November 27, 2011, Yaniz Estrada gave a statement to police. In the statement, Estrada explained that about two or three days before [the decedent]'s murder she was on the 3300 block of Waterloo Street when she was approached by [Appellant] and Sanabria. They asked Estrada if she was selling drugs and told her that she needed to stop selling. Estrada told them she was not selling drugs and they walked away. On the day of the murder, at about 5:00 p.m., Estrada arrived on the 3300 block of Waterloo Street. While she was in the area she said hello to [the decedent] and then went home.

At trial, Estrada confirmed that she was on the block on the day of the murder and had said hello to [the decedent]. Estrada denied that two days before the murder, [Appellant] and Sanabria had approached her. She also denied selling drugs at the time of the murder.

On November 27, 2011, Edwin Laboy gave a statement to police. Laboy stated that on the night of the murder when it was just starting to get dark, Laboy ran into [the decedent] near Westmoreland and Waterloo Streets. As he was talking to [the decedent, Appellant] and Sanabria approached them. Laboy started to walk away and heard

four or five gunshots.  Laboy saw [Appellant] and Sanabria run away.  Laboy explained that [Appellant] and his friends had been selling PCP on the block and wanted rent money from Estrada, who was working with Miller and [the decedent].

At trial, Laboy confirmed that he had seen [the decedent] near Westmoreland and Waterloo Streets shortly before [the decedent] was murdered, but testified that he was on a different street when he heard about four or five gunshots.  Laboy walked back to Westmoreland and Waterloo Streets and went to [the decedent] who was shot and dying on the street.  Laboy explained that a few days before [the decedent]'s murder, . . .  there was an argument because [the decedent], Miller, and Estrada wanted to sell PCP on the block but [Appellant] did not want them to sell PCP without paying rent for it.

Trial Ct. Op., 10/29/13, at 2-6 (record citations omitted).  Appellant did not testify at trial and presented no evidence on behalf of his defense.

We reproduce the following portions of the trial record relevant to Appellant's prosecutorial misconduct claims.  The Commonwealth, in its opening statements, argued:

To understand this case, you need to understand that this area near Waterloo Street and Westmoreland is a very high-crime, very high-drug area.

[Appellant's counsel]: Objection.  Objection.

THE COURT: That's overruled.

[Commonwealth]: It's the kind of area where people don't want to come forward and talk to police.  People don't want to get involved.

[Appellant's counsel]: Objection.

THE COURT: Overruled.

[Commonwealth]: It's the kind of area where, when the police are on the scene, even though people saw what happened, they're not going to run up to the police and say, hey, I got information, take my name, let me give a statement. It's actually quite the opposite. People don't want to get involved, and they certainly don't want people to see them interacting with the police. To understand this case, you need to understand why that is, the fear that comes along with being involved in cooperating with the police and telling them the truth and coming to court and testifying and pointing the finger, and it's essential that you understand that to understand this case.

\*   \*   \*

. . . The witnesses are not paid actors that are going to get up there and act the way you think they should. These are people that live in our city, and they have the pressures that come along with testifying, that fear that I talked about, that code of the streets that say you don't talk to detectives, you don't testify, and you certainly don't point the finger from that stand.

No one in this case is probably going to cooperate, meaning no one is going to willingly get on this stand and tell you what happened the way they told detectives what happened and point the finger in court.

\*   \*   \*

. . . So I'm giving you the heads-up that many of these witnesses that get on the stand are going to be hostile. They're going to be hostile. They might be belligerent. They won't want to answer questions. They're going to deny that they saw anything. They may deny that they gave a statement. They're going to do everything they can to distance themselves from that statement that they gave to detectives where they identified the people who committed this murder. If that happens, you may say, well, What are we doing here? These witnesses take the stand. They say they didn't see anything. Well, it doesn't stop there because all of you took an oath that you would listen to all the evidence and not make up your mind until

- 7 -

you heard all of the evidence and Her Honor's instructions on the law.

And the law is smart, and the law has a way to get justice. And the law says if someone gets on that stand and they recant, that means they get on that stand and they say I didn't see nothing, I didn't say nothing, I didn't say that, and you think that they're not telling the truth on that stand, that they're just acting out of fear or the code of the street, but you agree that what they said in their signed statement to detectives was the truth, then you may consider that signed statement as evidence, substantive evidence as to whether or not this defendant committed this crime. . . . You decide, Do I believe what's on that witness stand or do I believe what the detectives wrote down that the witnesses told them in that statement? I want to give you a heads-up to look out for that, and that's probably going to happen in this case.

N.T., 6/25/13, at 29-30, 35, 37-39.

During the Commonwealth's direct examination of Walker, the following exchange occurred:

[Commonwealth]: And, sir, when I did talk to you in the room before you testified at the preliminary hearing [and recanted a prior statement to police], didn't I ask you to make sure nothing happened to you in prison, meaning no one had got to you in prison?

[Appellant's counsel]: Judge, I object.

THE COURT: Let's not do the leading questions. Rephrase it. That's sustained.

[Commonwealth]: The nature of my conversation with you with respect to being in prison on open cases, wasn't it in the respect of [sic] if anyone had got to you in prison or threatened you in prison?

[Appellant's counsel]: Objection.

THE COURT: That's overruled.

[Commonwealth]: Do you remember, sir?

\*    \*    \*

[Commonwealth]: When I came in there to speak with you before the preliminary hearing, wasn't it in the context of: While you're in prison, did anyone get to you or threaten you in relation to this case?

[Walker]: No.  You told me that when you found out that me and [Appellant] were both in the same jail, you moved me over to another cell.

[Commonwealth]: Right, because I found out that you and [Appellant]—

[Appellant's counsel]: Objection.

THE COURT: Hold on. [To the Commonwealth,] You can't testify, . . . but I want to make sure.

You were told that you were changed to a different jail or [Appellant] was?

[Walker]: No.  She moved me to E block.

THE COURT: You got moved to a different block?

[Walker]: Yeah.

THE COURT: All right.

[Appellant's counsel]: My objection, meaning it's overruled?

THE COURT: It's overruled.  I asked the question.  He was transferred to a different block.

But, ladies and gentlemen, I am going to instruct you at this point, we're going into this testimony as to how it affects the witness's credibility, his believability, what he said, whether he said different things.

There's absolutely no evidence at this point that there's any inappropriate behavior by [Appellant] in this case, and that's not why this testimony is being elicited.

All right. You may proceed.

[Commonwealth]: I'm sorry. You said that I moved you to another block.  Why was that?

THE COURT: What was his understanding?

[Commonwealth]:  What was your understanding of why that was?

[Walker]: Because you thought [Appellant] wanted to do something to me.

[Appellant's counsel]: Objection.  May I see Your Honor at sidebar.

THE COURT: That's overruled and we'll go to sidebar later.

But I will once again instruct the members of the jury, again, the DA's mental state and/or the detective's is not relevant here.  What's relevant is what the witness, his mental state.

Proceed.

[Commonwealth]: Prior to me moving you to another block, were you and [Appellant] in the same block?

[Appellant's counsel]: Objection.

THE COURT: That's overruled.  Were you on the same block?

[Walker]: Not on the same block. We were, like, maybe across.  Like, maybe, like, there are four pods on the same unit.

THE COURT: Okay.

- 10 -

[Commonwealth]: So you were across in the same unit?

THE COURT: He just said he was not in the same pod, but it was in the same general area.

[Walker]: Yes.

*Id.* at 195-96, 197-200.

During the Commonwealth's direct examination of Laboy, the following exchanges occurred:

[Commonwealth]: Now, did you stay and tell the police, I was just talking to him seconds before he got shot?

[Laboy]: No, I never told them that. That was never my intention to talk to the cops.

[Commonwealth]: You don't like cops; right?

[Laboy]: Nope.

[Commonwealth]: Did you stay and tell the police about what was going on over drug territory on the block?

[Laboy]: No.

[Commonwealth]: Why not?

[Laboy]: Because that's not me.

[Commonwealth]: Now—

[Laboy]: It is now.

[Commonwealth]: What do you mean it is now?

[Laboy]: Never mind.

[Commonwealth]: Go ahead. What do you mean it is now?

[Laboy]: What do I mean? It's because when the word get out, I'm done in Philadelphia. In other words, I got to leave.

[Commonwealth]: What do you mean by that?

[Appellant's counsel]: Judge, I object.

THE COURT: That's overruled.

[Commonwealth]: What do you mean, sir?

[Laboy]: My life will be in danger.

[Appellant's counsel]: Objection.

[Laboy]: That's what I mean.

THE COURT: Overruled.

[Commonwealth]: Your life will be in danger when it gets out, what, that you talked to the police?

[Laboy]: That I'm sitting here and spoke to the police, period.

* * *

[Commonwealth]: Do you remember identifying that picture of [Appellant from a photographic array on November 27, 2011]?

[Laboy]: Yes.

[Commonwealth]: Okay. Is that the person that was Fred [Miller]'s stepson[, *i.e.*, Appellant] or stepson's friend?

[Laboy]: I don't know if he was a friend or a stepson. Like I said, it was a bunch of them there. I don't know which one was his stepson.

[Commonwealth]: Okay. Did you sign and circle that picture?

[Laboy]: Yes.

[Commonwealth]: And is that the same person that's in the courtroom?

[Laboy]: I don't know.  It don't look like him.  Like I said, he been in jail a long time.  He look different.

[Appellant's counsel]: Objection.

THE COURT: Well, no.  The statement stands. . . .

N.T., 6/26/13, at 65-67, 74-75.

During closing statements, the Commonwealth argued:

[Commonwealth]: Just because [the decedent] said, There goes those bitch ass niggas, doesn't mean he's the aggressor.  I want to just comment on that because the word "nigga," I don't like it, but I think in this case it wasn't meant to call anyone a racial slur.

[Appellant's counsel]: Objection.

THE COURT: That's overruled.

*     *     *

[Commonwealth]: And by the way, just because [the decedent] said words to somebody, words under the law does not mean that someone is justified to gun you down. Words never justify deadly force.

[Appellant's counsel]: Objection.

[Commonwealth]: And her Honor will explain that.

THE COURT: That's an argument that the Commonwealth is making in this case.  That objection is overruled, but I suggest that the DA confine her remarks to this case, not generally.

*     *     *

[Commonwealth]: In this case I told you in the opening that the witnesses in this case are probably going to recant on that stand. They're probably going to come in and say I didn't say that or distance themselves from their statement, and we talked about why.

Fear is a very powerful thing. No one wants to be a witness in a homicide case, and there's no evidence in this case that [Appellant] or Brandon or anyone on their behalf directly threatened anyone. But it's not that. It's the general fear, and this is where your common sense and your collective street smarts come in. People do not want to be involved in a homicide.

People do not want it to get out on the street that they are cooperating with the police and taking the stand and pointing the finger because, unfortunately, in our city, there is a culture of no snitching. There is a street code where it says if you go in there and you tell on somebody in court, you're a snitch. And you don't have to like it. You don't have to agree with it. I want it to stop, but unfortunately it's the reality.

I can't go home and I can't provide body guards for every witness to protect them after they testify in this case. Any witness that gives a statement to detectives, even if they come on the stand and recant, has to always look over their shoulder wants [sic] it gets out that they told.

[Appellant's counsel]: Judge, I object to all of this.

THE COURT: That's sustained. Let's move on. Let's talk about this case.

[Commonwealth[8]]: In this case, these witnesses were able to tell the truth to the detectives, but when they got on the stand, they would not admit that they said that in court.

---

[8] We have added this notation to the Commonwealth based on the tenor of the closing statement. The original transcript did not contain a notation delineating the trial court's ruling from the Commonwealth's resumption of its argument.

And, again, it comes from that fear that they know what these young guys are capable of.

\* \* \*

The medical examiner, the autopsy. The [decedent] was shot a total of three times. Two of them are in the back which lodged into his body, and they were .25-caliber, which are small. It's not a powerful gun, but if you get someone in the right spot, it's obviously deadly.

These are the two times in the victim's back. One of them is in his torso in his pelvis area and out of his buttocks. This is likely the .40, the .40 is a very powerful gun, and that bullet from that .40 went right though his body as opposed to the smaller caliber .25s which lodged in his body. Absolutely that shot came from his [Appellant's] gun.

[Appellant's counsel]: Objection.

THE COURT: Again, members of the jury, it's going to be your recollection of the evidence that controls, and you will take whatever inference from the evidence that's been presented.

\* \* \*

[Commonwealth]: This is not a self-defense case. Let's get something straight. Self-defense means that he is completely justified. If you find that there's self-defense in this case, you are saying you, [Appellant], when you're trying to assert your drug turf, when you're carrying that gun that you don't have a license to carry and no business carrying, when you're going around threatening people, and you go up to them and you pull out your gun and you blast, that you are completely justified. That's what self-defense means.

[Appellant's counsel]: Objection.

THE COURT: That's overruled.

\* \* \*

Using deadly force is an extreme that is only supposed to be used if he has a sincere and reasonable belief that he's in a kill-or-be-killed situation.

*    *    *

First of all, nothing in the record shows that he sincerely and reasonably believed that he was going to be killed. Nothing on this record.

[Appellant's counsel]: Objection.

[Commonwealth]: He doesn't duck. He doesn't hide.

THE COURT: Again, that's overruled. The jury will make that decision.

*    *    *

[Commonwealth]: There's no evidence that [Appellant] did not provoke the situation. Actually, he did provoke the situation. He provoked the situation when he made that threat to two days before to [Estrada]. He provoked the situation when him and his friend were carrying an unlicensed gun that they have no business carrying. He provoked the situation by trying to assert his authority over that block selling PCP. So he does not have clean hands. You cannot in this scenario ever claim self-defense.

[Appellant's counsel]: Objection.

THE COURT: That's overruled.

N.T., 6/28/13, at 48-50, 52-53, 70-71, 76, 80.

Following the arguments by counsel, the trial court instructed the jury on first- and third-degree murder, and voluntary manslaughter based on an unreasonable belief in the need to use deadly force, and self-defense. *Id.* at 119, 122, 124-25, 126-28. The court also issued cautionary instructions

regarding testimony of Appellant's incarceration and the witnesses' concerns about testifying. *Id.* at 109-11. The court denied Appellant's request for an instruction on voluntary manslaughter—heat of passion. N.T., 6/27/13 at 96.

On July 1, 2013, the jury found Appellant guilty of third-degree murder, conspiracy, and carrying firearms in public in Philadelphia. On August 27th, the trial court sentenced Appellant to twenty to forty years' imprisonment for third-degree murder, a consecutive five to ten years' imprisonment for conspiracy, and a consecutive one to two years' imprisonment for carrying firearms in public in Philadelphia. On September 5th, Appellant filed timely post-sentence motions challenging the sufficiency of the evidence regarding third-degree murder and the weight of the evidence.[9] The trial court denied those motions on September 9th.

Appellant filed a timely notice of appeal on September 18, 2013, and, after timely requesting an extension, complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement. This appeal followed.

---

[9] Appellant's post-sentence motion did not include claims of inadmissible evidence, improper arguments to the jury, and allegations of "prosecutorial misconduct." Nevertheless, Appellant objected contemporaneously at trial and preserved all issues raised in this appeal. *See* Pa.R.Crim.P. 720(B)(1)(c) ("Issues raised before or during trial shall be deemed preserved for appeal whether or not the defendant elects to file a post-sentence motion on those issues."). Moreover, Appellant's sufficiency challenge to his conspiracy conviction was preserved in his Pa.R.A.P. 1925(b) statement. *See* Pa.R.Crim.P. 606(A)(7).

Appellant presents the following questions, which we reproduce, but reorder as follows:

> [ ]WAS THE EVIDENCE INSUFFICIENT TO SUPPORT THE CHARGE OF CRIMINAL CONSPIRACY TO COMMIT MURDER?
>
> [ ]DID THE TRIAL COURT ERR BY REFUSING TO CHARGE THE JURY ON HEAT OF PASSION VOLUNTARY MANSLAUGHTER BECAUSE THE EVIDENCE SUPPORTED THE GIVING OF THAT INSTRUCTION?
>
> [ ]DID THE TRIAL COURT ERR IN OVERRULING AN OBJECTION TO TESTIMONY THAT APPELLANT HAD BEEN IN JAIL A LONG TIME?
>
> [ ]DID THE TRIAL COURT COMMIT AN ABUSE OF DISCRETION BY OVERRULING NUMEROUS OBJECTIONS AND A MOTION FOR A MISTRIAL MADE AFTER TESTIMONY THAT PERMITTED THE JURY TO INFER THAT APPELLANT THREATENED WITNESSES?
>
> [ ]DID THE TRIAL COURT COMMIT AN ABUSE OF DISCRETION IN OVERRULING A MOTION FOR A MISTRIAL MADE AFTER THE PROSECUTOR ARGUED DURING HER OPENING ARGUMENT THAT WITNESSES WERE RELUCTANT TO TESTIFY BECAUSE OF FEAR, WHICH PERMITTED THE JURY TO INFER THAT APPELLANT WAS THE SOURCE OF THE THREATS?
>
> [ ]DID THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN FAILING TO GRANT A MISTRIAL FOLLOWING SEVERAL OBJECTIONABLE COMMENTS THE PROSECUTOR MADE DURING HER CLOSING SPEECH?

Appellant's Brief at 4.

Preliminarily we summarize Appellant's eleven arguments encompassed in his questions presented. First, Appellant argues the evidence was insufficient to convict him of conspiracy. *Id.* at 18-28. He claims the evidence only established his presence at the scene and his

spontaneous reaction to the decedent's aggression. According to Appellant, this evidence did not support the jury's conclusion that he came to a criminal agreement with Sanabria to shoot the decedent. In support, he refers this Court to *inter alia*, **Commonwealth v. Kennedy**, 453 A.2d 927 (Pa. 1982), **Commonwealth v. Menginie**, 383 A.2d 870 (Pa. 1978), **Commonwealth v. Fields**, 333 A.2d 745 (Pa. 1975), **Commonwealth v. Wilson**, 296 A.2d 719 (Pa. 1972), and **Commonwealth v. Johnson**, 513 A.2d 476 (Pa. Super. 1986).

Second, Appellant argues the trial court erred in failing to instruct the jury on voluntary manslaughter—heat of passion. Appellant's Brief at 38-45. He claims evidence that the decedent's use of a slur constituted sufficient provocation for the court to instruct the jury regarding a killing committed in the heat of passion.

Appellant's remaining arguments allege prosecutorial misconduct and/or error in the rulings of the trial court overruling his objections and requests for mistrial. Specifically, Appellant directs his third argument to Walker's testimony that the Commonwealth transferred him within a jail at which Appellant was also housed. *Id.* at 31. Appellant's fourth and fifth arguments focus on Laboy's testimony that he believed his life was in danger and Laboy's reference to Appellant's incarceration. *Id.* at 29-31, 36-38. Sixth, Appellant argues the Commonwealth impermissibly argued to the jury that he threatened the witnesses. *Id.* at 32-36, 55-57. Appellant's

underlying argument in these three claims is that the Commonwealth burdened his presumption of innocence and suggested he was a person of bad character and acted in conformity with that character. *See* Pa.R.E. 404(b) (stating evidence of wrongs not generally admissible to prove character and action in accordance character, but may be admissible for another purpose such as motive).

Seventh, Appellant asserts the trial evidence did not support the Commonwealth's argument that he caused the non-fatal wound to the decedent's hip. Appellant's Brief at 57-60. Eighth, he challenges the Commonwealth's closing statement that the decedent's slur, "bitch ass nigga," was not intended as a racial insult. *Id.* at 49-52.

Appellant, in his ninth argument, claims the Commonwealth's assertion that "[w]ords never justify deadly force" misstated the law of self-defense. *Id.* at 52-55. Tenth, he asserts the Commonwealth mischaracterized the law of self-defense by arguing that he did not sincerely believe in the need for self-defense. Appellant's eleventh argument focuses on the Commonwealth's argument that self-defense was not available based on his criminal behavior. *Id.* at 60-64.

For the reasons that follow, we conclude no relief is due in light of Appellant's first, second, and fourth through tenth argument. Although Appellant's third and eleventh arguments implicate prosecutorial misconduct

and/or trial error, we conclude he has not demonstrated sufficient prejudice to establish his entitlement to a new trial.

Appellant first argues the evidence was insufficient to sustain the jury's finding that there was a criminal agreement between him and Sanabria to shoot the decedent. Our review of the sufficiency of the evidence is governed by the following principles.

> [W]e view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth in deciding whether the evidence was sufficient to establish each element of the crimes beyond a reasonable doubt.
>
> Moreover, when conflicts and discrepancies arise, it is within the province of the jury to determine the weight to be given to each witness's testimony and to believe all, part, or none of the evidence as it deems appropriate.
>
> \* \* \*
>
> To convict of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

***Commonwealth v. Geiger***, 944 A.2d 85, 90-91 (Pa. Super. 2008) (citations and punctuation omitted); ***see also*** 18 Pa.C.S. § 903 (a)(1).

As the Pennsylvania Supreme Court observed in **Kennedy**, "more than **mere association** of participants in crime must be shown.  Thus, persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant [to] a common plan, agreement, or understanding."  **Kennedy**, 453 A.2d at 930 (citations omitted) (emphasis in original) (holding evidence that brawl in which codefendants participated occurred was alone insufficient to demonstrate existence of conspiracy); **accord Menginie**, 383 A.2d at 872-73 (noting evidence "might warrant the inference that [the defendant] and his companions expressly or tacitly agreed to taunt or 'bully' the victim and his family," but holding such evidence was insufficient to support inference of unlawful agreement to kill or inflict serious bodily injury); **Fields**, 333 A.2d at 745 (holding evidence insufficient to establish accomplice liability where there was "nothing in the testimony to indicate [defendant] had any prior knowledge of [codefendant's] lethal intent or that [defendant] in anyway counseled or participated in the shooting"); **Wilson**, 296 A.2d at 721 (holding evidence of defendant's participation in bar fight with victim was insufficient to prove his shared intent to commit homicide "where a third party decide[d] on his own initiative to become a participant in an affray between two others and without any request or encouragement . . . alter[ed] radically the nature and course of the encounter" by stabbing victim); **Johnson**, 513 A.2d at 477-78 (holding evidence—that defendant and two codefendants exited bar, one

codefendant stated, "Here comes a white boy. Let's get him," and second codefendant shot decedent—only proved defendant's mere presence and thus was insufficient to sustain convictions for, *inter alia*, murder and conspiracy).

Instantly, when viewed in a light most favorable to the Commonwealth, the record established the following. Appellant lived at his stepfather's residence. Days before the shooting, Appellant and Sanabria demanded payments from Estrada to sell drugs in the neighborhood. Appellant and Sanabria's encounter with Estrada led to their argument with the decedent. Thus, the Commonwealth presented background evidence of an association between Appellant and Sanabria, as well as an existing dispute with the decedent.

With respect to the shooting, the undisputed evidence established that Appellant and Sanabria encountered the decedent on the street and began shooting shortly thereafter. Although there was conflicting testimony regarding the events precipitating the shooting, the evidence established his active participation in an agreed upon course of action with Sanabria. Specifically, Appellant warned the decedent "was trying to reach," and drew his .40 caliber pistol. The presence of the two .40 caliber shell casings at the scene suggested he fired at least two shots, despite his assertion that his pistol jammed. Sanabria drew his .25 caliber pistol and fired five shots, two of which struck the decedent in the back and mortally wounded him.

In light of this evidence, we conclude the cases cited by Appellant are inapposite. The instant record shows that Appellant was an active participant in the shooting, encouraged the actions taken by Sanabria by issuing the warning and drawing his own pistol, and that Sanabria's actions did not radically alter the nature of the confrontation set in motion by Appellant. *Cf. Kennedy*, 453 A.2d at 930; *Menginie*, 383 A.2d at 872-73; *Fields*, 333 A.2d at 745; *Wilson*, 296 A.2d at 721; *Johnson*, 513 A.2d at 477-78. Furthermore, if the jury elected to credit Laboy's testimony that Appellant and Sanabria approached the decedent and began firing without provocation, such evidence would also establish the existence of a conspiracy to commit homicide. Accordingly, we discern no merit to Appellant's sufficiency challenge to his conspiracy conviction.

Second, Appellant argues the trial court erred in denying his request for an instruction on voluntary manslaughter—heat of passion. It is well settled that:

> [a] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict. Third degree murder is a killing done with legal malice, but without the specific intent to kill; voluntary manslaughter is a form of homicide that involves the specific intent to kill, but contains no legal malice as a result of passion and provocation.

*Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1260-61 (Pa. Super. 2014) (*en banc*) (citations and punctuation omitted). When considering the adequacy of an alleged provocation for voluntary manslaughter, we apply an

objective standard and ask "whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection." **Commonwealth v. Berry**, 336 A.2d 262, 264 (Pa. 1975) (citation and punctuation omitted). The Pennsylvania Supreme Court has long observed, "[I]nsulting or scandalous words are not sufficient cause of provocation." **Commonwealth v. Drum**, 58 Pa. 9, 17 (1868); **accord Commonwealth v. Mouzon**, 53 A.3d 738, 751 (Pa. 2012); **Berry**, 336 A.2d at 264 (distinguishing **Drum** and holding that words conveying facts could constituted adequate provocation).

Instantly, viewing the record in a light most favorable to Appellant, the decedent's slur "bitch ass nigga" occurred in the context of his ongoing dispute with Appellant and Sanabria. However, we discern no evidence that Appellant spontaneously reacted to the slur. Rather, as discussed above, Appellant exclaimed that the decedent or the decedent's friend was "reaching" for a weapon before Appellant drew his own weapon. Given this evidence, we discern no basis to disturb the trial court's conclusion that a voluntary manslaughter—heat of passion instruction was not warranted, **see Buterbaugh**, 91 A.3d at 1260-61, but that voluntary manslaughter— unreasonable belief in the need for self-defense was available. **See** Trial Ct. Op. at 18. Thus, no relief is due.

As noted above, Appellant's next nine arguments allege prosecutorial misconduct and/or the improper admission of evidence. The following principles govern our consideration of these claims.

> [The] declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with the law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

***Commonwealth v. Culver***, 51 A.3d 866, 871 (Pa. Super. 2012) (citation and punctuation omitted).

When assessing whether misconduct or error occurred during the Commonwealth's arguments to the jury,

> [i]t is well-established that comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in the jurors' minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict. A prosecutor's remarks in opening statements must be fair deductions from the evidence the

> Commonwealth intends to offer, which the prosecutor believes, in good faith, will be available and admissible at trial. In closing arguments, a prosecutor may comment on the evidence and any reasonable inferences arising from the evidence.

***Commonwealth v. Arrington***, 86 A.3d 831, 853 (Pa. 2014) (citations and punctuation omitted).

As to the trial court's evidentiary rulings, "the admissibility of evidence is a matter addressed to the sound discretion of the trial court and that an appellate court may only reverse upon a showing that the trial court abused its discretion." ***Commonwealth v. Ragan***, 645 A.2d 811, 818 (Pa. 1994) (citation omitted). The court may exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence. Pa.R.E. 611(a). The court may also "question witnesses to clarify existing facts and to elicit new information." ***Commonwealth v. Hogentogler***, 53 A.3d 866, 880 (Pa. Super. 2012) (citation omitted).

If misconduct or error occurred at trial, a defendant must show prejudice resulted. ***See Culver***, 51 A.3d at 871. In reviewing the trial court's determination regarding prejudice, we are mindful that prompt and adequate cautionary instructions can cure the harmful effects of the impropriety or error. ***Commonwealth v. Moury***, 992 A.2d 162, 176 (Pa. Super. 2010); ***see also Commonwealth v. O'Hannon***, 732 A.2d 1193, 1196 (Pa. 1999) (reiterating that "[a]bsent evidence to the contrary, the jury is presumed to have followed the trial court's instructions.").

Appellant's third argument focuses on the Commonwealth's examination of Walker, during which it was revealed (1) Appellant was incarcerated before trial; (2) Appellant was in the same jail as Walker; and (3) the Commonwealth moved Walker to a different cell because the prosecutor was concerned that Appellant "wanted to do something" to Walker. N.T., 6/25/13, at 197-200. Appellant asserts that this exchange was prejudicial because it "blemish[ed him] with unsupported allegations of witness intimidation." Appellant's Brief at 31.

With respect to evidence of threats, this Court has noted,

> In general, threats by third persons against witnesses are not relevant and thus not admissible into evidence unless the defendant is linked in some way to the making of the threats. Nevertheless, an exception to the rule exists where the evidence in question was not offered to prove the accused's guilt but to explain a witness's prior inconsistent statement.

*Commonwealth v. Bryant*, 462 A.2d 785, 788 (Pa. Super. 1983) (citations and punctuation omitted); *accord Commonwealth v. Brewington*, 740 A.2d 247, 256 (Pa. Super. 1999).

The Pennsylvania Supreme Court has observed "there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Commonwealth v. Johnson*, 838 A.2d 663, 680 (Pa. 2003). Nevertheless, our courts recognize that "constant reminders" of a defendant's incarceration may affect the jury's judgment and burden the defendant's right to the

presumption of innocence. *See Estelle v. Williams*, 425 U.S. 501, 503-504 (1976); *Johnson*, 838 A.2d at 681.

In *Brewington*, this Court concluded that evidence that the defendant was in the same jail as a witness was not objectionable. *Brewington*, 740 A.2d at 256. The Court noted the witness recanted a prior statement implicating the defendant and determined that evidence the defendant had access to the witness in jail could "show the possibility of [the witness] being threatened or coerced by [the defendant] to change his testimony." *Id.* Thus, the *Brewington* Court concluded that the defendant's counsel was not ineffective for failing to object to the evidence of the defendant's incarceration. *Id.*

Although evidence that Appellant had access to Walker in jail could be relevant to explain Walker's recantation at trial, *see id.*, the Commonwealth's questioning is problematic. The Commonwealth's exchange with Walker required the trial court to sustain Appellant's objection, instruct the Commonwealth not to testify, issue two cautionary instructions, and question the witness from the bench.[10] N.T., 6/25/13, at

---

[10] By contrast, in *Brewington*, the testimony of the defendant's incarceration was elicited as follows:

> [By the prosecution]. How long were you at Delaware County?
>
> [The Witness]. I believe about three weeks, maybe.

197-200. Moreover, having elicited testimony that Walker and Appellant were housed in the same jail, *id.* at 197, the Commonwealth, over Appellant's objections, persisted in questioning Walker on why he thought the prosecutor moved him to a different jail. *Id.* at 198 (asking Walker, "You said that I moved you to another block. Why was that?" which trial court rephrased as "What was his understanding?"). Walker responded he believed **the prosecutor** thought Appellant "wanted to do something" to Walker while they were in the same jail. *Id.* at 199. Such testimony was improper and resulted from an objectionable line of questioning calling for Walker's understanding of the prosecutor's decision to move him.

Thus, we consider whether the trial court erred in concluding that the prejudice resulting from the exchange was cured by the court's cautionary

Q. How long?

A. Three or four weeks.

\* \* \*

Q. And you were there. Tell the ladies and gentlemen of the jury who else was there, at the time you were there, who is here on trial today?

[Counsel for co-defendant]. Objection.

A. [The Witness] Which jail?

Q. [By the prosecution] Delaware County?

A. [Appellant.]

*Brewington*, 740 A.2d at 256 (record citation omitted).

- 30 -

instructions. *See Culver*, 51 A.3d at 871; Trial Ct. Op. at 10. During the Commonwealth's exchange with Walker, the court issued cautionary instructions directing the jury to consider the "testimony as to how it affects the witness's credibility, his believability, what he said, whether he said different things." *Id.* at 198. The court also observed, "There's absolutely no evidence at this point that there's any inappropriate behavior by the defendant in this case, and that's not why this testimony is being elicited." *Id.* Although the trial court overruled Appellant's objection to Walker's testimony that the prosecutor thought Appellant "wanted to do something" to him, it again instructed the jury, "[T]he DA's mental state . . . is not relevant. What's relevant is what the witness, his mental state." *Id.* at 199. Moreover, in its final charge to the jury, the court again cautioned the jury that there was no evidence that Appellant threatened a witness and emphasized that the evidence of the witnesses' concerns about testifying were admitted for "one purpose only, and that is to use it to assess their credibility as a witness." N.T., 6/28/13, at 111.

Following our review, we conclude Appellant has not demonstrated the improper questioning of Walker resulted in undue prejudice. Appellant focuses on the Commonwealth's suggestion, without an adequate evidentiary basis, that he threatened witnesses. Appellant's Brief at 36. He submits that the jury was susceptible to accept the Commonwealth's suggestion and use it as evidence of his bad character. *Id.* The trial court,

however, promptly cautioned the jury that there was no evidence Appellant threatened Walker and informed the jury of the proper purposes of the evidence the Commonwealth was intending to elicit. Moreover, Appellant does not argue that the cautionary instructions were inadequate. Thus, given the arguments presented, we decline to disturb the trial court's opinion that a new trial was not necessary.

Appellant's fourth and fifth arguments focus on the trial court's decision to overrule his objections to Laboy's testimony that (1) he was afraid of testifying and (2) Appellant was "in jail a long time." As recited more fully above, the Commonwealth questioned Laboy regarding his failure to stay at the scene of shooting to report the incident to police. Laboy responded he did not immediately cooperate with police, "[b]ecause that's not me." N.T., 6/26/13, at 66. Laboy then interrupted the Commonwealth's next question stating, "It is now." *Id.* The Commonwealth then elicited Laboy's explanation that he was "done in Philadelphia" and had to leave because his life "will be in danger" for speaking to police and being in court. Subsequently, the Commonwealth questioned Laboy regarding his identification of Appellant from a photographic array during a police interview on November 27, 2011. N.T., 6/26/13, at 74-75. The Commonwealth showed Laboy the array presented to him by police on November 27, 2011, and confirmed he selected Appellant's picture. *Id.* at 75. After the Commonwealth asked, "And is that the same person that's in

the courtroom," Laboy responded that Appellant had been "in jail for a long time" and looked different. ***Id.***

We conclude the evidence that Laboy believed he was "done" in Philadelphia and believed his life was in danger was related to an explanation of the variations between his trial testimony and prior statements to police. Consequently, we discern no abuse of discretion in overruling Appellant's objection admitting this testimony. ***See Bryant***, 462 A.2d at 788. Furthermore, we reiterate that the trial court, in its final charge, emphasized there was no evidence Appellant threatened the witnesses and properly instructed the jury that the testimony was admitted to evaluate the credibility of the given witness. N.T., 6/28/13, at 110-11. Accordingly, we decline to disturb the trial court's determination that a mistrial was not required based on Laboy's testimony that his life was in danger for giving a statement to police and testifying at trial.

As to Laboy's reference to Appellant's pretrial incarceration, the record supports the trial court's determination that although the testimony was improper, the Commonwealth did not intentionally elicit Laboy's testimony. Although the trial court overruled Appellant's objection, the court expressly addressed Laboy's testimony in its final charge to the jury. Moreover, as discussed above, the Commonwealth's examination of Walker earlier at trial previously disclosed Appellant's pretrial incarceration. Accordingly, we conclude Laboy's passing reference to Appellant's incarceration alone, or in

conjunction with Walker's testimony, did not cause undue prejudice requiring a new trial.

In his sixth claim, Appellant asserts the Commonwealth impermissibly suggested he threated witnesses in its opening and closing statements. However, we discern no merit to Appellant's contention that the Commonwealth's references to the witnesses' fears in its opening statement were improper. The Commonwealth's warning to the jury that its witnesses would likely recant was a fair deduction from the evidence it intended to offer, namely, the witnesses' prior inconsistent statements to police. *See Arrington*, 86 A.3d 831, 853; *see also Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa. 2012) (holding conviction based on prior inconsistent statement did not violate due process). Further, we discern no basis to conclude the Commonwealth did not have a good-faith belief that at least some evidence regarding its witnesses' fears would be admissible. *See Arrington*, 86 A.3d at 853; *Bryant*, 462 A.2d at 788; *Brewington*, 740 A.2d at 256. Similarly, the Commonwealth's comments upon the witnesses' reluctance to testify or cooperate with police was properly based on the evidence, *see Arrington*, 86 A.3d at 853, and did not unduly suggest Appellant had threatened the witnesses.

Although the Commonwealth's statements that the prosecutor could not provide bodyguards and that witnesses have "to always look over their shoulder" were intemperate, the trial court sustained Appellant's objection to

that argument and issued a cautionary instruction regarding the absence of evidence that Appellant threatened the witnesses. Consequently, we decline to disturb the trial court's determination that a mistrial was not warranted based on the Commonwealth's opening and closing statements.

Appellant's seventh and eighth arguments challenge the Commonwealth closing statements suggesting that he shot the decedent with the .40 caliber pistol and opining the decedent's slur was not intended as a racial insult.

Following our review, we conclude that the Commonwealth's argument that the wound to the decedent's hip was caused by the .40 caliber firearm was proper. The medical evidence at trial established two .25 caliber bullets were recovered from the decedent's chest, but the bullet causing the wound to the decedent's hip was not recovered. N.T., 6/25/13, at 64. The Commonwealth presented expert evidence that a .40 caliber bullet is larger and more powerful than a .25 caliber bullet. N.T., 6/26/13, at 218. Accordingly, the Commonwealth's suggestion that a larger, more powerful bullet may have travelled through the decedent was not an unreasonable inference based on the evidence.

As to Appellant's contention that the Commonwealth improperly suggested the slur "nigga" did not have a racial component, we agree with the trial court this comment fell within the bounds of permissible argument. Moreover, the Commonwealth's comment constituted a fair response to

Appellant's suggestion that the slur evinced the decedent's initial aggression and precipitated Appellant's belief in the need for self-defense. *See* N.T., 6/28/13, at 18-19. Thus, the trial court properly denied relief.

Appellant's ninth and tenth arguments focus on the Commonwealth assertion that "[w]ords never justify deadly force" and Appellant did not sincerely believe he was going to be killed. According to Appellant, these comments misstated the law of self-defense.

We are mindful that "[t]here is no prohibition against a prosecutor discussing applicable law in his closing argument, as long as he states the law clearly and accurately." *Commonwealth v. Rios*, 684 A.2d 1025, 1034 (Pa. 1996) (citation omitted). However, "[i]t is obviously improper for counsel to misstate the law or to state it in a manner calculated to confuse the jury[.]" *Commonwealth v. Hardcastle*, 546 A.2d 1101, 1110 (Pa. 1988) (citation omitted).

Section 505 of the Crimes Code defines self-defense as follows:

> **(a) Use of force justifiable for protection of the person.**—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force.**—
>
>        \*   \*   \*
>
>     (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is

necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . .

18 Pa.C.S. § 505(a), (b)(2)(i)-(ii). The reasonableness of a defendant's belief in the need to use deadly force "encompasses two aspects, one subjective and one objective." *Mouzon*, 53 A.3d at 751. The subjective aspect requires the defendant act "out of an honest and bona fide belief that he was in imminent danger." *Id.* at 752 (citation omitted).

Appellant's assertion that the prosecutor impermissibly argued that words alone are insufficient aggression to sustain a claim of self-defense is unsupported and misplaced. Our review reveals no case in which the mere utterance of a slur constituted sufficient evidence to warrant self-defense. Furthermore, *Mouzon*, which Appellant relies upon, does not stand for the proposition that words may constitute the basis for self-defense. The *Mouzon* Court referenced the traditional rule that words alone generally are not provocation, but rejected the defendant's claim that his conduct did not provoke an encounter with the victims and negate his clam self-defense. *Id.* at 751. In any event, as discussed above, the evidence established that Appellant did not react to the insult, but to the alleged threat posed by the

decedent when the decedent or the decedent's friend reached for a gun. Accordingly, Appellant has not demonstrated that the Commonwealth misstated the law of self-defense as it applied in this case.

We similarly discern no merit to Appellant's claim that the Commonwealth's use of the term "sincerely" misstated the law of self-defense. As noted above, a claim of self-defense requires consideration that the defendant subjectively acted "out of an honest and bona fide belief was in imminent danger." *Id.* at 752. Therefore, the Commonwealth's argument that "nothing in the record shows [Appellant] sincerely and reasonably belief he was going to be killed" did not mischaracterize the law of self-defense. *See id.*

Appellant's eleventh claim is the Commonwealth improperly argued he provoked the situation by threatening Estrada two days before, carrying an unlicensed gun, and trying to assert authority over PCP sales in the neighborhood. *See* N.T., 6/28/13, at 80 (indicating Commonwealth argued Appellant "provoked the situation when he made that threat to two days before to [Estrada]. He provoked the situation when him and his friend were carrying an unlicensed gun that they have no business carrying. He provoked the situation by trying to assert his authority over that block selling PCP. So he does not have clean hands. You cannot in this scenario ever claim self-defense.").

As noted above, the concept of "provocation," which negates a self-defense claim, is defined as follows: "[t]he use of deadly force is not justifiable . . . if: . . . the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter." 18 Pa.C.S. § 505(b)(2)(i). Thus, "to establish that an actor was the aggressor or provoker and, hence, was not entitled to claim a defense of self-defense or defense of others, there must be some evidence to support the inference that the defendant's acts constituted an intent to cause death or serious bodily injury." *Commonwealth v. Samuel*, 590 A.2d 1245, 1248 (Pa. 1991) (punctuation omitted). Moreover, Section 505(b)(2)(i) requires that the defendant's aggression or provocation occur "in the same encounter."

At the outset, we agree with the Commonwealth that it was entitled to argue that Appellant instigated the event by approaching the decedent and shooting and suggest that such acts were motivated by Appellant's attempt to "assert his authority" over the sale of PCP. *See* Pa.R.E. 404(b) (stating evidence of wrongs not generally admissible to prove character and action in accordance with character, but may be admissible for another purpose such as motive). Indeed, the Commonwealth did so in other areas of its closing argument without objection. *See* N.T., 6/28/13, at 81 (arguing, Appellant "knew what he was doing. He knew he was armed, and he knew what he

wanted to do. Him and [Sanabria] wanted to kill [the decedent] and show how tough they were.").

However, the Commonwealth's argument suggesting Appellant provoked the situation by engaging in several bad acts before the shooting was misplaced. Rather than arguing motive, the Commonwealth suggested that the jury reject his claim of self-defense because Appellant committed several wrongs before the encounter and "did not have clean hands." Accordingly, the argument exceeded the proper bounds of closing statements. *See* Pa.R.E. 404(b).

Thus, we consider whether Appellant established sufficient prejudice as to warrant the declaration of mistrial. Initially, we note that the trial court's final charge contained the general instruction that the jury apply only the law given to it by the court. N.T., 6/28/13, at 96. The trial court also gave an extensive instruction on the law regarding self-defense. *Id.* at 127-34. The court's instruction properly explained that provocation, for the purposes of rebutting a claim of self-defense required the jury to find "that in the same encounter with the victim, [Appellant] engaged in conduct that demonstrated his intent to cause death or serious bodily injury." *Id.* at 131. The trial court repeated its complete instructions on third-degree murder and voluntary manslaughter-unreasonable belief when asked to do so by the jury. *Id.* at 155-161.

Our further review compels the conclusion that Appellant did not suffer undue prejudice. Instantly, the Commonwealth proceeded on a theory of general homicide and argued in support of a first-degree murder conviction. *See id.* at 73-75 (arguing first-degree murder because Appellant and Sanabria were carrying illegal firearms to "assert their dominance on the street," stated their intention to Estrada, and "took their guns out" and shot their "intended target"). However, the jury rejected that argument and returned a verdict of third-degree murder.

We acknowledge the possibility the Commonwealth prejudiced the jury's consideration of third-degree murder, voluntary manslaughter, and justification. However, no admissible evidence demonstrated that the decedent or his friend were armed at the time or reached for a weapon. Rather than retreating, Appellant and Sanabria fired seven rounds. Although one bullet struck the decedent's front hip, the two shots, those fired by Sanabria, struck the decedent in the back. Thus, we discern no record evidence rebutting the presumption that the trial court's instructions dissipated the taint of the Commonwealth's improper closing statement. Accordingly, we discern no basis upon which to disturb the trial court's conclusion that a new trial was not required.

Judgment of sentence affirmed.

J. S26045/14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2015